**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

MARY KINCAID-CHAUNCEY,
            *Defendant-Appellant.*

No. 06-10544

D.C. No.
CR-03-00500-2-
LRH

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
February 27, 2008—Las Vegas, Nevada

Filed February 20, 2009

Before: Alex Kozinski, Chief Judge, Marsha S. Berzon and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Concurrence by Judge Berzon

## COUNSEL

Franny A. Forsman, Federal Public Defender, Las Vegas, Nevada, for appellant Mary Kincaid-Chauncey.

Daniel R. Scheiss, Assistant United States Attorney, Las Vegas, Nevada, for appellee United States.

## OPINION

BYBEE, Circuit Judge:

Mary Kincaid-Chauncey appeals her convictions for honest services wire fraud, aiding and abetting honest services wire fraud, conspiracy to commit honest services wire fraud, and Hobbs Act extortion under color of official right. Kincaid-Chauncey raises three claims of error: She claims that the district court precluded her from calling witnesses to support her

defense and that the district court gave erroneous instructions on both the honest services fraud and the extortion counts. For the reasons that follow, we affirm the district court's judgment.

I

This case requires us to delve into the tawdry relationship between a Las Vegas strip club owner and several former Clark County elected officials. The Clark County Board of County Commissioners has jurisdiction over unincorporated Clark County, Nevada. Its territorial jurisdiction includes, importantly, the famous Las Vegas strip, with its lucrative hotels, casinos, and associated enterprises. The Clark County Commission has seven members, whose responsibilities include enacting ordinances and issuing permits governing the operation of businesses in Clark County. Mary Kincaid-Chauncey, the defendant-appellant in this case, held the elected office of Clark County Commissioner from 1997 to 2004.

Michael Galardi and his step-father operated a strip club named Cheetahs in the City of Las Vegas from 1991 to 2003. Business apparently was good, so, in 1999, Galardi made plans to expand his adult entertainment operations by opening two new strip clubs, Jaguars and Leopard Lounge. Galardi chose to open his new enterprises outside of the City of Las Vegas, in surrounding Clark County.

Galardi needed to obtain a variety of permits from the Clark County government to open his new strip clubs, including liquor licenses and business permits. Galardi also wanted the Commission to relax the ordinances governing strip clubs in Clark County. Specifically, Galardi sought an ordinance permitting dancers in strip clubs to dance completely nude and to permit clubs with all nude dancers to serve alcohol. He also sought to prevent passage of ordinances that would have required dancers in clubs serving alcohol to be at least 21

years old and forbidden dancers to touch their patrons. When it became difficult to work within the strictures of the county ordinances, Galardi sought to annex the land on which Jaguars was located into the City of Las Vegas.

In 1999 Galardi began a corrupt relationship with Lance Malone, who was a Clark County commissioner from 1997 to 2000. After leaving office in 2000, Malone quickly gained employment with Galardi, working as a "lobbyist" of sorts. Malone's chief duties in his new job included establishing relationships with public officials—including his former colleagues on the county commission[1] —and delivering bribe money from Galardi to the officials. The scheme was to be short-lived, however, as the FBI began investigating Galardi's operations in 2000. The Bureau obtained wiretap authorizations to monitor the telephones of Galardi and Malone in June 2001, the wiretaps continued until December 2002. The FBI executed search warrants of Galardi's strip clubs and other locations on May 14, 2003. Federal agents simultaneously confronted several people involved in the bribery ring, including Galardi, Kincaid-Chauncey, and Kenny.

The FBI's investigation revealed that the bribery scheme worked as follows: Galardi would typically give cash—normally in $5,000 or $10,000 increments—to Malone to distribute to various public officials, usually county commissioners, in exchange for favorable action on ordinances, permits, and licenses affecting the operation of his two new strip clubs. Occasionally, Galardi would personally bribe the officials. The bribery payments occurred at various locations, including in restaurants, inside parked cars, and at the officials' homes. To assure himself that the officials actually received the

---

[1]In addition to Kincaid-Chauncey, two other Clark County commissioners were alleged to have received illegal bribes from Galardi: Dario Herrera and Erin Kenny. Kenny and Galardi eventually cooperated with the investigation and pled guilty to various charges. Herrera was tried with Kincaid-Chauncey.

money Malone was instructed to give them, Galardi told Malone to have the officials call Galardi, using Malone's cell phone, to tell him "thanks" after they received the money.

On February 21, 2006, a second superseding indictment charged Kincaid-Chauncey, Herrera, and Malone with conspiracy, aiding and abetting, honest services wire fraud, and extortion under color of official right. *See* 18 U.S.C. §§ 2, 371, 1343, 1346, 1951. The indictment charged Kincaid-Chauncey with receiving four payments from Galardi.

The first payment alleged in the indictment occurred on August 2, 2001. Malone met with Kincaid-Chauncey in her car in the parking lot of a restaurant. After the meeting, Kincaid-Chauncey called Galardi using Malone's cell phone, and told him "thanks for all your help." On that same day, Kincaid-Chauncey's son, who had been having financial difficulties, deposited $3,800 in cash to his bank account. About one hour after this meeting, Malone called Erin Kenny and said, "[W]e've got Mary Kincaid on board." Around this time, Kincaid-Chauncey voted on matters before the county commission that affected Galardi's business interests without disclosing any conflict of interest. Specifically, on August 29, 2001, she voted to approve a limited liquor license for the Jaguars strip club. On September 25, 2001, she voted to extend the Jaguars liquor license for an additional month. Tape-recorded telephone conversations introduced at trial also established that Kincaid-Chauncey was taking orders from Malone and Galardi. For example, on September 14, 2001, Malone said to Kincaid-Chauncey, "Mike has an item on the agenda on the nineteenth . . . . We also need you on the twenty-fifth." Kincaid-Chauncey replied, "Yeah, I'll be there."

The second payment alleged in the indictment occurred on October 24, 2001. Malone met Kincaid-Chauncey at her home and paid her $5,000 in cash. Shortly after the meeting, Kincaid-Chauncey called Galardi to thank him. On the same

day, Malone called Galardi because he found an extra $300 in his pocket when he was changing his pants. Malone said, "I don't know if she got it all . . . I think she only got uh forty-seven." Malone then called Kincaid-Chauncey and asked her if she got "a total of five." She responded that she did. A week later, on October 31, 2001, and again on November 28, 2001, Kincaid-Chauncey voted to approve liquor licenses for Galardi's strip clubs without disclosing her conflict of interest. Kincaid-Chauncey admitted at trial to having received this $5,000 from Malone, but she testified that the payment was a campaign contribution to help pay debts incurred in her son's unsuccessful campaign for a seat on the North Las Vegas City Council.

The third payment alleged in the indictment occurred in February 2002. Malone called Kincaid-Chauncey on February 23, 2002, to set up a lunch meeting with Galardi on February 28. After Kincaid-Chauncey, Malone, and Galardi had lunch together, Malone and Kincaid-Chauncey got in Kincaid-Chauncey's car, where Malone allegedly gave her $5,000. On March 27 and April 30, 2002, Kincaid-Chauncey again voted on matters affecting Galardi's strip clubs without disclosing her conflict of interest.[2]

The fourth and final payment alleged in the indictment occurred in June 2002. Kincaid-Chauncey called Malone on June 3, 2002, to tell him that her grandson had been accepted into an Olympic ski school but needed $15,000 for the tuition. Galardi said that he gave Kincaid-Chauncey $5,000 through Malone sometime in June 2002. Kincaid-Chauncey admitted receiving $4,000—not $5,000—from Malone during a tour of Jaguars with her daughter. A series of recorded telephone conversations followed this payment in June and July 2002, in which Malone gave Kincaid-Chauncey explicit instructions on how Galardi wanted her to vote on ordinances governing

_____

[2]As noted *infra*, Kincaid-Chauncey was acquitted of the Hobbs Act charge based on this payment.

nude dancing. For example, on July 30, 2002, discussing an upcoming hearing on the all nude dancing ordinance, Malone told Kincaid-Chauncey that "I'm sure Mike's not gonna want you to . . . hang your head out there . . . and get it chopped off." On July 31, 2002, Malone called Kincaid-Chauncey and told her to put her cell phone on vibrate during the hearing on the ordinance so he could call to tell her what to say if he needed to.[3] Kincaid-Chauncey told Malone that she would be voting in favor of an ordinance that limited the touching between nude dancers and their patrons, even though Galardi opposed it, because she did not want to "be the only one voting against it." On that same day, Kincaid-Chauncey voted for the limited touch ordinance. A few days later on August 5, 2002, without disclosing her relationship with Galardi, she submitted a memorandum to the county manager requesting that the County Commission reconsider the limited touch ordinance. In her memorandum, she said that she voted in favor of it because she thought the City of Las Vegas would be considering, and was likely to pass, a similar ordinance and she wanted the rules to be uniform in the city and county to make it easier for the metropolitan police to enforce the ordinances. Her memorandum said that she had since learned that the city would not be considering such an ordinance. This claim contradicted the substance of a conversation on July 29, 2002, between Malone and Kincaid-Chauncey before the limited touch ordinance was passed. In that conversation, Malone told Kincaid-Chauncey that the limited touch ordinance would "put the county businesses at a . . . competitive disadvantage" with strip clubs in the City of Las Vegas.

On the basis of those four payments, Kincaid-Chauncey was indicted for one count of conspiracy to deprive the Clark County Commission and the citizens of Clark County of their

---

[3]Malone in fact did call and leave her a message during the hearing, suggesting to her what she should say during the meeting. Phone conversations of a similar nature—with Malone telling Kincaid-Chauncey what to say at various hearings—occurred throughout August 2002.

right to honest services in violation of 18 U.S.C. §§ 371, 1343, and 1346; nine counts of honest services wire fraud in violation of 18 U.S.C. §§ 2, 1343, and 1346;[4] and four counts of Hobbs Act color of official right extortion in violation of 18 U.S.C. § 1951.[5]

Kincaid-Chauncey stood trial jointly with Dario Herrerra in March 2006.[6] During the eight week trial, Kincaid-Chauncey pursued two lines of defense. First, she argued that Malone had deceived Galardi into thinking that he had given the money to the county commissioners, but had really kept the money for himself (the Theft Theory). Second, she argued that Galardi exaggerated the extent of his bribery scheme, implicating numerous innocent public officials to gain a bargaining advantage with the prosecutors (the Liar Theory).

To pursue these theories, Kincaid-Chauncey questioned Galardi on cross-examination about whether he paid money to nine other public officials, including, in no particular order: Thom Reilly, the Clark County Manager; Mark Scofield, the Clark County Tax Assessor; Lynette Boggs-McDonald, a Las Vegas City Council member; Oscar Goodman, the mayor of the City of Las Vegas; Ardel Jorgensen, a Clark County business licensing official; David Roger, the Clark County District Attorney; Lee Gates and Donald Mosley, both Clark County District Court judges; and Yvonne Atkinson-Gates, a Clark County Commissioner and the wife of Judge Gates. Kincaid-Chauncey also introduced evidence of inconsistent statements regarding whether Galardi paid money to those officials, and she sought to call each of the nine officials to contradict Galardi's testimony.

---

[4]The honest services wire fraud counts were based on telephone calls made on the following dates: August 2, 2001; September 14, 2001; October 24, 2001; February 23, 2002; June 5, 2002; July 31, 2002; August 5, 2002; August 19, 2002; and September 5, 2002.

[5]The Hobbs Act charges were based on payments allegedly received on August 2, 2001; October 24, 2001; February 28, 2002; and in June 2002.

[6]Lance Malone eventually pleaded guilty to a reduced set of charges.

The district court permitted Kincaid-Chauncey to call Thom Reilly and Mark Scofield. Thom Reilly was the Clark County Manager during the time period in question. Galardi testified on cross-examination that he had given $5,000 in cash to Thom Reilly as a bribe. The district court permitted Kincaid-Chauncey to call Reilly at trial because Galardi's testimony "directly concerned a payment which Galardi testified was made to Malone and that Galardi assumed . . . had been paid to Reilly." Reilly testified that he never received any money from Galardi.

Mark Scofield was the Clark County Tax Assessor. Galardi testified on cross-examination that he gave Scofield $5,000 in cash. Galardi was impeached with prior inconsistent statements he made to the FBI concerning another $5,000 check payment he claimed to have made to Scofield. The district court permitted Kincaid-Chauncey to call Scofield at trial, but she declined to do so.

First, the district court ruled that the testimony was admissible to impeach by contradiction under *United States v. Castillo*, 181 F.3d 1129 (9th Cir. 1999). Second, the court ruled that the testimony was admissible, under Federal Rule of Evidence 404(b), to establish Malone's scheme or plan to steal the bribe money he received from Galardi. At trial, Kincaid-Chauncey called Reilly but not Scofield.

The district court ruled that Kincaid-Chauncey could not call any of the other seven witnesses. Again relying on *Castillo*, the court ruled that their testimony was not admissible to impeach by contradiction because it sought to contradict testimony elicited on cross-examination. The court also denied Kincaid-Chauncey's request to admit the testimony under Rule 404(b). Kincaid-Chauncey made the appropriate objections to these rulings at trial.

Kincaid-Chauncey advanced the Theft Theory at trial by calling Reilly, who testified that he never received money that

Galardi allegedly gave to Malone to give to him and that Malone never offered him any money. Kincaid-Chauncey also introduced evidence of Malone's previous acts of fraud as well as a telephone call between Malone and his father. In the call, Malone's father tells Malone that it would not be a good idea to keep $20,000 that Galardi had given to Malone to bribe a public official. Kincaid-Chauncey advanced the Liar Theory at trial by calling various FBI agents and other government employees who Galardi claimed to have paid off. She also introduced numerous examples of Galardi's prior inconsistent statements.

As the trial drew to a close, Kincaid-Chauncey objected to the proposed jury instructions for the honest services fraud and Hobbs Act charges. She argued that the instructions for both the honest services fraud counts and the Hobbs Act counts should require the jury to find the existence of a *quid pro quo* as an element of the crime. The district court's final jury instructions did not incorporate the changes that Kincaid-Chauncey proposed.

On May 8, 2006, the jury found Kincaid-Chauncey guilty of all counts against her except the Hobbs Act charge based on the February 28, 2002, payment. At sentencing, the district court imposed a thirty-month term of incarceration to be followed by a two year period of supervised release.

II

Kincaid-Chauncey advances three claims. We address each in turn.

A

Kincaid-Chauncey first argues that the district court erred in refusing to permit her to call seven of nine proposed witnesses to advance her theories of defense.[7] For the reasons

---

[7]We review for abuse of discretion non-constitutional claims of error in excluding evidence. *See United States v. Lynch*, 437 F.3d 902, 913 (9th

explained below, we find that the district court did not deny Kincaid-Chauncey the opportunity to present a defense or abuse its discretion in refusing to admit the testimony of each of the seven contested witnesses. Because the determination of whether the evidence should have been admitted is particular to each witness, we briefly discuss each of Kincaid-Chauncey's proposed witnesses and their expected testimony.

Lynnette Boggs-McDonald was a member of the Las Vegas City Council from June 1999 until April 2004. She served as a Clark County Commissioner from April 2004 until she lost reelection in 2006. Galardi testified on cross-examination that he had given a campaign contribution to Boggs-McDonald, but that he did not remember how much or whether he had paid with cash or a check. He also testified that he did not expect anything in return for the contribution. This testimony conflicted with previous statements that Galardi made to investigators before trial that Galardi paid Boggs-McDonald $10,000 in cash through Lance Malone. Kincaid-Chauncey called an FBI agent who testified that Galardi told the FBI prior to trial that he had paid $10,000 in cash to Boggs-McDonald. The government and Kincaid-Chauncey stipulated that Galardi told the FBI before trial that he had paid public officials, including Boggs-McDonald, "upwards of six figures." The district court excluded Boggs-McDonald because Galardi's testimony about her was elicited on cross. Boggs-McDonald was expected to testify that she only received a $1,000 check as a campaign contribution from Galardi.

Oscar Goodman has been the mayor of the City of Las Vegas since June 1999. Galardi testified on cross-examination that he personally gave $10,000 to Oscar Goodman before Goodman began his original campaign for mayor. Goodman

_____

Cir. 2006) (en banc) (per curiam). We review *de novo* constitutional claims that an evidentiary ruling precluded the presentation of a defense. *Id.*

was expected to testify that he never received any money from Galardi.

Ardel Jorgensen was the Business Licensing Director for Clark County. On cross-examination, Galardi testified that he had Lance Malone give $20,000 in cash to Jorgensen at a meeting where Galardi was present. Galardi testified that he saw Malone put the money in Jorgensen's bag. Although Galardi did not consider the payment to be a bribe because he gave it to her in recognition of the help she had already provided, he acknowledged that it was illegal. Defense counsel impeached Galardi's testimony during cross-examination by asking about statements he made to his former attorneys indicating that he had not paid any money to Jorgensen. The defense expected that Jorgensen would testify that she never received any cash payment from Galardi.

David Roger has been the Clark County District Attorney since 2002. On cross-examination, Galardi testified that he gave a $20,000 check to Peter Christiansen, Galardi's attorney, to give to David Roger as a campaign contribution for Roger's bid to become the Clark County District Attorney. However, Galardi testified that Roger returned the check when it became public that he had accepted a campaign contribution from a strip club owner. Roger was expected to testify that he never received any illegal contributions from Galardi.

Donald Mosley has been a judge on the State of Nevada District Court since 1983. Galardi testified on cross-examination that he and his father gave about $50,000 to Mosley over a twenty year period but that they did not expect anything in return for those payments. Mosley was expected to testify at trial that he only received about $5,000 from Galardi during the twenty years in question.

Lee Gates has been a judge on the State of Nevada District Court since 1991. Galardi testified on cross-examination that

he contributed to Judge Gates's campaign by giving money to Peter Christiansen, though he could not remember the precise amount. He testified that he made the contribution in the hope that Gates would exert pressure on his wife, Yvonne Atkinson-Gates, to change her position on upcoming votes before the Clark County Commission. At trial, Gates was expected to testify that he did not receive any money from Galardi.

Yvonne Atkinson-Gates was a Clark County Commissioner from 1993 until March 2007. On cross-examination, Galardi testified that he never paid any money directly to Atkinson-Gates, but that he made a campaign contribution to her husband in the hope that it would influence Atkinson-Gates to reconsider her position on a matter before the Clark County Commission. Galardi further stated on cross-examination that Atkinson-Gates told Malone that "$100,000 would make any problems [with zoning issues] go away" while Atkinson-Gates was on a pre-opening tour of the strip club Jaguars. Atkinson-Gates was called as a witness but was not allowed to testify about whether she made that statement.

1

The district court ruled that the testimony of these seven witnesses was inadmissible because it constituted impeachment of cross-examination testimony by contradiction.[8] Kincaid-Chauncey asserts that this was error.

---

[8]Kincaid-Chauncey claims that the trial court incorrectly analyzed this issue as one of "the preclusion of the use of extrinsic evidence of specific instances of conduct by a witness delineated in Federal Rule of Evidence 608(b)." To the extent that Kincaid-Chauncey believes the district court excluded the evidence under Rule 608(b), she is mistaken. The court explicitly relied on *United States v. Castillo*, a case which abjures reliance on Rule 608(b) when analyzing questions of impeachment by contradiction. *See* 181 F.3d 1129, 1132 (9th Cir. 1999) ("Although Castillo briefed and argued the district court's ruling under Rule 608(b), impeachment by contradiction is not governed by that subsection."). Although impeachment by contradiction is not specifically formalized in the Federal Rules of Evidence, it is part of the general body of evidentiary law and is a permissible theory of impeachment under Federal Rule of Evidence 607. *Id.* at 1133.

**[1]** Impeachment by contradiction "permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence." *United States v. Castillo*, 181 F.3d 1129, 1132 (9th Cir. 1999). Impeachment by contradiction is an exception to the collateral fact rule embodied in Federal Rule of Evidence 608(b), which generally prohibits the introduction of extrinsic evidence to attack the credibility of a witness. When impeaching by contradiction, the fact to be contradicted must be material. 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE, § 608.20[3][a], at 608-38 (2d ed. 1999). Impeachment by contradiction is permitted to prevent witnesses from engaging in perjury and then using the prohibition on collateral fact testimony to conceal the perjury. *Castillo*, 181 F.3d at 1132-33 (citing 2A CHARLES A. WRIGHT & VICTOR J. GOLD, FEDERAL PRACTICE & PROCEDURE, § 6119, at 116-17 (1993)). We have also recognized that, when making the decision whether to permit impeachment by contradiction, trial courts should consider the Rule 403 factors, such as confusion of the jury or the cumulative nature of the evidence. *See id.* at 1133; 4 MCLAUGHLIN, § 607.06[3][b], at 607-79.

**[2]** Impeachment by contradiction comes with an important limitation. In general, a witness may be impeached by contradiction only if "the statements in issue [have] been volunteered on *direct* examination." *United States v. Green*, 648 F.2d 587, 596 n.12 (9th Cir. 1981) (emphasis added). In *Castillo*, we read our cases to hold that "extrinsic evidence may not be admitted to impeach testimony invited by questions posed during cross-examination." 181 F.3d at 1133. We explained that when the testimony to be contradicted is offered under cross-examination, impeachment by contradiction is far less likely to achieve its intended purpose of rooting out perjury because "opposing counsel may manipulate questions to trap an unwary witness into 'volunteering' statements on cross-examination" and because "it is often difficult to determine whether testimony is invited or whether it is volunteered on cross-examination." *Id.* at 1133-34. But we held that the general rule need not "be rigidly enforced so as to exclude

all impeachment by contradiction of testimony given during cross-examination." *Id.* at 1134 & n.1.

**[3]** In this case, all nine of the witnesses offered by Kincaid-Chauncey—Reilly, Scofield, and the seven excluded witnesses—were expected to contradict testimony Galardi gave during cross-examination. Under *Castillo*, the district court could have excluded the testimony of all nine witnesses. Such a ruling would have been well within our statement in *Castillo* that "extrinsic evidence may not be admitted to impeach testimony invited by questions posed during cross-examination. *Id.* at 1133. Nevertheless, after reviewing the transcript of Galardi's testimony carefully, the district court only excluded the testimony of seven of Kincaid-Chauncey's nine proffered witnesses. In an exercise of the discretion afforded in *Castillo*, the district court permitted Kincaid-Chauncey to call Reilly and Scofield. The district court explained that it did so because Galardi specifically testified that he gave money to Malone to give to those two individuals, and they were expected to testify that they never received any money. As the district court explained with respect to Reilly, although it was "a very close question" whether to permit his questioning, his testimony was "distinct from all of the others."

The district court then reviewed name-by-name its reasons for excluding the other seven witnesses. None of Galardi's trial testimony about six of the seven witnesses stated that he definitely remembered giving unlawful money to them directly or through Malone.[9] His testimony about three of

---

[9]Galardi did testify on cross-examination that he gave $20,000 to Malone to give to Jorgensen, who was expected to testify that she never received any money from Galardi. Her expected testimony thus appears to meet the criteria the district court placed on whether such testimony would be admitted. However, Galardi testified that he saw Malone put the money in Jorgensen's bag, so it would have been difficult to use this testimony to support Kincaid-Chauncey's Theft Theory. As for the Liar Theory, Galardi's pre-trial statement that he did not give any money to Jorgensen was used to impeach him at trial. Jorgensen's testimony thus would have added little to Kincaid-Chauncey's case.

them—Goodman, Roger, and Gates—concerned campaign contributions that were not alleged to have been given illegally. The testimony expected from Mosley would have simply disputed the aggregate amount of what apparently was a series of gifts over a twenty year period. Finally, Atkinson-Gates would have merely disputed making an entirely collateral statement during a tour of one of Galardi's strip clubs. Allowing the defendant to call the mayor, members of the city council, judges, and other public officials to testify about extraneous events would have created a huge sideshow to what was already a trial of notoriety. None of the proffered testimony was central to the core issues of the trial, and thus it is precisely the type of evidence that the collateral fact rule is designed to exclude.

**[4]** The district court's decision to exclude the testimony of the seven witnesses is well within our rule in *Castillo* and thus was not an abuse of discretion. Nor did the district court abuse its discretion by admitting some of the defendant's witnesses and not others. The district court plainly could have excluded all nine of the witnesses; even if, in its discretion, the court decides to admit the testimony of one or more witnesses, the court is not obligated to admit the testimony of all proffered witnesses.

2

Next, Kincaid-Chauncey argues that the testimony of the witnesses was admissible under Federal Rule of Evidence 404(b)[10] as proof of Malone's common scheme or plan to steal money from Galardi, which supported her Theft Theory. Of

---

[10]Federal Rule of Evidence 404(b) states in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

the seven excluded witnesses, only the testimony of Boggs-McDonald could possibly have advanced the theory that Malone was stealing the bribe money and is thus amenable to a Rule 404(b) analysis. However, Boggs-McDonald's expected testimony would not have provided support for the theory that Malone had a scheme to steal the bribe money that Galardi gave him. Galardi's cross-examination testimony concerning Boggs-McDonald was that he remembered making a campaign contribution, but that he could not remember whether he had paid her through Malone and that he did not remember making a statement to FBI investigators that he had paid her through Malone. The only evidence providing a foundation that Malone carried the money from Galardi to Boggs-McDonald—a necessary link to prove the theory that Malone stole the money—was Galardi's prior statements to FBI agents. Yet, as the government points out, under the hearsay rules these prior inconsistent statements only could be introduced as impeachment evidence, not substantive evidence. *See* FED. R. EVID. 801(d)(1). The defendant's remedy was to impeach Galardi by cross-examining him on his own inconsistent statements, not by calling additional witnesses. Accordingly, the district court did not err in ruling that Boggs-McDonald's testimony was not admissible under Rule 404(b).

3

Finally, Kincaid-Chauncey makes an overarching argument that the district court's refusal to admit the testimony of these witnesses deprived her of her Fifth Amendment right to due process and her Sixth Amendment right to present a defense, claims that we review *de novo*. *See United States v. Lynch*, 437 F.3d 902, 913 (9th Cir. 2006) (en banc) (per curiam).

**[5]** "The Constitution guarantees a criminal defendant a meaningful opportunity to introduce relevant evidence on his behalf." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions" and may have to " 'bow to accommodate other legitimate interests' " in criminal trials. *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)). Such interests include the orderly administration of the trial—governed by the rules of procedure—and the admission of reliable evidence. Our evidentiary rules do not violate the constitutional right to present a defense "so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " *Id.*; *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). To violate that standard, an evidentiary rule must "infringe[ ] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

We cannot see how Kincaid-Chauncey was denied her right to due process or to present a defense. As we discussed above, the rules against permitting impeachment by contradiction serve important trial management interests by keeping the trial focused on germane issues. Moreover, the district court permitted Kincaid-Chauncey to call two of the three witnesses (Reilly and Scofield) who would have advanced the Theft Theory. Kincaid-Chauncey ultimately called Reilly, but not Scofield. It is difficult to see how Kincaid-Chauncey was denied due process or an opportunity to put on her defense when she chose not to put on one of the witnesses she claims she needed. A third witness Kincaid-Chauncey argues would have advanced her Theft Theory was Boggs-McDonald. But, as we pointed out in the previous section, Galardi did not make any statements on either direct or cross-examination that he gave Malone any money to give to Boggs-McDonald. The only statements in the record concerning payment to Boggs-McDonald via Malone are statements that Galardi made to the FBI. As unsworn prior inconsistent statements, these statements could only be admitted to impeach Galardi, not to establish that Galardi in fact did give money to Malone to give to Boggs-McDonald. Nothing in the Constitution

requires that Kincaid-Chauncey be permitted to introduce extrinsic evidence under these circumstances.

None of the six witnesses proffered for the Liar Theory would have advanced that theory, either. As noted above, three of the witnesses would have disputed whether Galardi gave them campaign contributions (Goodman, Roger, and Gates); one would have disputed the amount of a series of gifts (Mosley); and one would have disputed whether she made a collateral statement (Atkinson-Gates). The final proffered witness, Jorgensen, would have directly contradicted Galardi's cross-examination testimony, but Kincaid-Chauncey was permitted to impeach Galardi with his prior inconsistent statement concerning the payment to Jorgensen. The marginal value that would have accrued to the defense from Jorgensen's testimony does not make the rule governing impeachment by contradiction "arbitrary" or "disproportionate to the purposes [it is] designed to serve." *Scheffer*, 523 U.S. at 308.[11]

**[6]** We are confident that no violation of Kincaid-Chauncey's constitutional right to present a defense occurred because she was permitted to advance these two theories through numerous other methods. The district court permitted her to call two witnesses to testify in support of the Theft Theory. She also introduced evidence of Malone's previous acts of fraud under Rule 404(b), and she introduced a recorded telephone conversation where Malone's father told Malone it

---

[11]It we were to accept Kincaid-Chauncey's argument that the Constitution requires district courts to admit extrinsic evidence in these circumstances, it would virtually eliminate the prohibition on introducing extrinsic evidence for impeachment purposes whenever a testifying co-defendant cooperates with the government: Although she styles her defense in part as the "Liar Theory," the theory is nothing more than the routine impeachment of a co-conspirator who turned state's evidence. The end result would be that the impeachment by contradiction exception to the prohibition on extrinsic impeachment evidence would swallow the general rule.

would not be a good idea to keep for himself $20,000 that Galardi had given to Malone to give to a public official. Kincaid-Chauncey had a full and fair opportunity to present the Liar Theory, as well. It is obvious that Galardi was a troublesome witness for the government, as he was frequently confronted with prior inconsistent statements made to either the FBI or his previous attorneys. The record is replete with rigorous cross-examination of Galardi on the consistency of his statements and testimony from FBI agents, which called the truthfulness of Galardi's testimony into question.

[7] For these reasons, we conclude that the district court's exclusion of the seven witnesses did not deprive Kincaid-Chauncey of due process or her constitutional right to present a defense.

* * * *

In sum, we conclude that the district court did not err in excluding the testimony of the seven challenged witnesses.

## B

Kincaid-Chauncey next challenges the jury instructions given on the Hobbs Act charges. She alleges that the district court erred by failing to instruct the jury that an explicit *quid pro quo* was necessary to convict her of violating the Hobbs Act.[12] Although we agree that the government must prove the existence of a *quid pro quo* to obtain a conviction under the Hobbs Act for non-campaign related payments, we reject the notion that the *quid pro quo* needs to be explicitly stated.

---

[12]We review the question of whether a jury instruction correctly states the elements of a crime *de novo*. *United States v. Phillips*, 367 F.3d 846, 854 (9th Cir. 2004). "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999).

**[8]** The Hobbs Act, among other things, prohibits a wide variety of activities that fall under the general rubric of extortion. Specifically, it says:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The statute defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or *under color of official right*." *Id.* § 1951(b)(2) (emphasis added).

To convict Kincaid-Chauncey of Hobbs Act extortion under a color of official right theory, the government was required to prove that she (1) was a government official; (2) who accepted property to which she was not entitled; (3) knowing that she was not entitled to the property; and (4) knowing that the payment was given in return for official acts; (5) which had at least a *de minimis* effect on commerce. *See* 18 U.S.C. § 1951(b)(2) (defining extortion); *Evans v. United States*, 504 U.S. 255, 268 (1992); *United States v. Boyd*, 480 F.3d 1178, 1179 (9th Cir. 2007) (requiring "only a *de minimis* effect on interstate commerce to support a Hobbs Act prosecution"); *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (intent is a required element of a Hobbs Act conviction).

**[9]** In *McCormick v. United States*, the Supreme Court held that when the defendant is charged with color of official right extortion and the unlawfully gained property is in the form of a campaign contribution, the government must prove that

there was an explicit *quid pro quo*. 500 U.S. 257, 271-74 (1991); *see also United States v. Ganim*, 510 F.3d 134,142 (2d Cir. 2007) ("[P]roof of an express promise is necessary when the payments are made in the form of campaign contributions."). However, "[w]hether or not there is a *quid pro quo* requirement in the non-campaign context is an issue that has not been directly addressed by the Supreme Court." *United States v. Collins*, 78 F.3d 1021, 1034 (6th Cir. 1996). Nevertheless, "[a]lmost all the circuits that have addressed this precise issue have held that the *quid pro quo* requirement applies to all Hobbs Act extortion prosecutions, not just to those involving campaign contributions." *United States v. Tucker*, 133 F.3d 1208, 1215 (9th Cir. 1998) (collecting cases); *see also Evans*, 504 U.S. at 278 (Kennedy, J., concurring) ("[T]he rationale underlying the Court's holding [in *McCormick*] applies not only in campaign contribution cases, but in all § 1951 prosecutions."); *Ganim*, 510 F.3d at 143; *United States v. Antico*, 275 F.3d 245, 258 (3d Cir. 2001); *United States v. Giles*, 246 F.3d 966, 972-73 (7th Cir. 2001); *Collins*, 78 F.3d at 1035; *United States v. Martinez*, 14 F.3d 543, 553 (11th Cir. 1994).

**[10]** In *Tucker*, we assumed without deciding that a prosecution for extortion under color of official right in the non-campaign contribution context required a *quid pro quo*. 133 F.3d at 1215 (upholding against a sufficiency of the evidence challenge Hobbs Act color of official right extortion convictions). Today, we join our sister circuits and make explicit the *Tucker* assumption: We hold that a conviction for extortion under color of official right, whether in the campaign or non-campaign contribution context, requires that the government prove a *quid pro quo*.

**[11]** That being said, it is well established that to convict a public official of Hobbs Act extortion for receipt of property other than campaign contributions, "[t]he official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing

winks and nods." *Evans*, 504 U.S. at 274 (Kennedy, J., concurring). An explicit *quid pro quo* is not required; an agreement implied from the official's words and actions is sufficient to satisfy this element. *See id.* at 268 (majority opinion) ("[The] Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."); *Ganim*, 510 F.3d at 143; *Antico*, 275 F.3d at 258; *Giles*, 246 F.3d at 972.

Applied to this case, these principles clearly demonstrate that the jury was properly instructed on the Hobbs Act counts. The district court instructed the jury as follows:

> In order for a defendant to be found guilty of [violating § 1951], the Government must prove each of the following elements beyond a reasonable doubt:
>
> First, the defendant was a public official.
>
> Second, the defendant obtained money, which the defendant knew he or she was not entitled to.
>
> Third, the defendant knew that the money was given in return for taking some official action.
>
> And, four, commerce or the movement of an article, commodity, or people in commerce from one state to another was affected in some way.
>
> In the case of a public official who obtains money, other than a campaign contribution, the Government does not have to prove an explicit promise to perform a particular act made at the time of the payment. Rather, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence as specific opportunities arise.

Kincaid-Chauncey argues that this instruction was erroneous because it "instructed the jury that no proof of a *quid pro quo* was required for counts involving non-campaign contributions." We reject her argument.

**[12]** Although "[n]o specific instruction to find an express *quid pro quo* was given," *Antico*, 275 F.3d at 259, this instruction adequately stated the implicit *quid pro quo* element that *Evans* requires. The instruction tells the jury that it can only find a defendant guilty if it finds that she "knew that the money was given in return for taking some official action." It then elaborates that the government does not have to show an express promise, but the public official must understand that "she is expected as a result of the payment to exercise particular kinds of influence as specific opportunities arise." "[A]lthough the magic words *quid pro quo* were not uttered, a simplified version of the concept, the idea that 'you get something and you give something,' was." *Giles*, 246 F.3d at 973.

**[13]** The circuits that have considered similar language in jury instructions for Hobbs Act color of official right extortion charges have approved it. In *United States v. Ganim*, for example, the former mayor of Bridgeport, Connecticut, was charged with violating, among other statutes, § 1951 for receiving a variety of non-campaign related payments and kickbacks. *See* 510 F.3d at 137-40. At trial, the district court instructed the jury on the *quid pro quo* element: "The government does not have to prove an explicit promise to perform a particular act made at the time of payment. It is sufficient if the defendant understood he was expected as a result of the payment to exercise particular kinds of influence, that is, on behalf of the payor, as specific opportunities arose." *Id.* at 144. The Second Circuit held that there was no error in that charge, in light of the fact that the preceding paragraph of the jury instruction specified that the payment needed to be "in return for official acts." *Id.* at 145. As in *Ganim*, this jury charge—that "the defendant knew that the money was given

in return for taking some official action"—required a link between the payment and the exercise of official acts. *See also United States v. Bradley*, 173 F.3d 225, 231 (3d Cir. 1999) (upholding similarly worded jury instruction because it "complies with the most recent Supreme Court holding on the issue of whether an agreement is required for conviction under the Hobbs Act"); *accord Giles*, 246 F.3d at 972 ("[W]e . . . agree with the Ninth Circuit in *Tucker* that the government need not show an explicit agreement, but only . . . that the public official understood that as a result of the payment he was expected to exercise particular kinds of influence on behalf of the payor."); *Tucker*, 133 F.3d at 1215 ("The government need not show an explicit agreement . . . the government need only show that [the public official] received the payment knowing that [it] was made in return for official acts" (internal quotation marks omitted)); *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993) ("[I]t is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise.").

**[14]** Accordingly, we find no error in the district court's jury instruction concerning non-campaign related payments received by Kincaid-Chauncey charged as Hobbs Act violations.

## C

Finally, Kincaid-Chauncey asserts that the district court erred in failing to instruct the jury that the crime of honest services fraud requires proof of a *quid pro quo*. For the reasons that follow, we conclude that the district court's jury instructions were adequate.

### 1

The wire fraud statute states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. For decades, federal prosecutors have used § 1343, as well as the substantially similar mail fraud statute, 18 U.S.C. § 1341, to develop a theory of "honest services fraud." Honest services fraud occurs when an employee deprives his employer of its right to have its affairs conducted "free from deceit, fraud, dishonesty, conflict of interest, and self-enrichment," and consistent with the employee's fiduciary duties to the employer. *United States v. Woodward*, 149 F.3d 46, 54 (1st Cir. 1998). In cases involving public officials, the theory relies on the idea that "a public official acts as 'trustee for the citizens and the State . . . and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty' to them." *United States v. Silvano*, 812 F.2d 754, 759 (1st Cir. 1987) (quoting *United States v. Mandel*, 591 F.2d 1347, 1363 (4th Cir. 1979)).

In *McNally v. United States*, the Supreme Court held that the mail fraud statute did not extend to cover honest services fraud. 483 U.S. 350, 359-60 (1987). Concerned about the ambiguity of the outer bounds of an honest services fraud theory and afraid to "involve[ ] the Federal Government in setting standards of disclosure and good government for local and state officials," the *McNally* Court instructed Congress to "speak more clearly" if it wanted to make honest services fraud a crime. *Id.* at 360.

[15] Congress "chose to 'speak more clearly' " the very next year by adding § 1346 to Title 18 of the United States

Code. *United States v. Weyhrauch*, 548 F.3d 1237, 1243 (9th Cir. 2008); *see* Act of Nov. 18, 1988, Pub. L. 100-690, 102 Stat. 4181, 4508 (1988) (codified at 18 U.S.C. § 1346). Section 1346 supplies a definition: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." By enacting § 1346, Congress revived the pre-*McNally* rules on honest services fraud. *See, e.g.*, *Weyhrauch*, 548 F.3d at 1243 ("[W]e turn for guidance in construing the statute to our pre-*McNally* case law and any relevant post-*McNally* decisions, and then consider pre- and post-*McNally* decisions from our sister circuits."); *United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008) ("[Section 1346] superseded *McNally* and reinstated the line of cases preceding it."); *United States v. Williams*, 441 F.3d 716, 722 (9th Cir. 2006) ("[B]y overruling *McNally*, Congress restored the pre-*McNally* landscape."); *United States v. Rybicki*, 354 F.3d 124, 136-37 (2d Cir. 2003) (en banc). *But see United States v. Brumley*, 116 F.3d 728, 733 (5th Cir. 1997) ("Congress [in passing § 1346] could not have intended to bless each and every pre-*McNally* lower court 'honest services' opinion . . . . Congress, then, has set us back on a course of defining 'honest services,' and we turn to that task.").

"The 'intangible rights' theory [of honest services fraud] has been a subject of controversy in the history of the federal mail and wire fraud statutes," *Williams*, 441 F.3d at 721, and, we would add, it continues to cause controversy despite (or perhaps because of) Congress's statutory abrogation of *McNally*. The greatest source of controversy, "given the amorphous and open-ended nature of § 1346," has arisen over "the need to find limiting principles" to cabin the broad scope of § 1346.[13] *Sorich*, 523 F.3d at 707. Without some kind of

---

[13]The courts of appeals have turned to at least four different kinds of limiting principles for § 1346. The Fifth Circuit has held that the public official must have violated some state law to be convicted of honest services fraud. *See, e.g.*, *Brumley*, 116 F.3d at 734-35; *see also United States*

limiting principle, honest services wire fraud could potentially make relatively innocuous conduct subject to criminal sanctions. *See* Julie R. O'Sullivan*, The Federal Criminal "Code" Is a Disgrace: Obstruction Statutes as Case Study*, 96 J. CRIM. L. & CRIMINOLOGY 643, 663 (2006) ("[R]ead literally, [§ 1346] would make a crime of the nondisclosure of virtually every breach of any public or private employment relationship —turning § 1346 into a 'draconian personnel regulation' that transforms private and governmental 'workplace violations into felonies.' " (quoting *United States v. Czubinski*, 106 F.3d 1069, 1077 (1st Cir. 1997))).

Playing off of this sentiment, Kincaid-Chauncey claims that, without a *quid pro quo* requirement, the honest services

*v. Panarella*, 277 F.3d 678, 692-93 (3d Cir. 2002) (finding violation of state law to be sufficient to demonstrate a violation of § 1346, but declining to decide whether it was necessary to show a violation of § 1346). We have recently held that "the government does not need to prove an independent violation of state law to sustain an honest services fraud conviction." *Weyhrauch*, 548 F.3d at 1248. The Seventh Circuit has held that "[m]isuse of office . . . for *private gain* is the line that separates run of the mill violations of state-law fiduciary duty . . . from federal crime," *United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998) (emphasis added), but defines "private gain" broadly to include "illegitimate gain, which usually will go to the defendant, but need not." *Sorich*, 523 F.3d at 709. The First and Tenth Circuits, in contrast, have held that intent is a sufficient limiting element. *See United States v. Sawyer*, 239 F.3d 31, 41 (1st Cir. 2001) ("*Sawyer* II"); *United States v. Welch*, 327 F.3d 1081, 1106 (10th Cir. 2003) (" '[T]he only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services.' " (quoting *Rybicki*, 287 F.3d at 262)). Finally, the Third Circuit has held that when the theory of prosecution is that a public official accepted a bribe, honest services fraud requires a *quid pro quo*. *United States v. Kemp*, 500 F.3d 257, 281-82 (3d Cir. 2007). As explained in further detail *infra*, we agree with the Third Circuit that, for a bribery theory of honest services fraud, a *quid pro quo* is required; we also agree with the First and Tenth Circuits that all honest services frauds require proof of the defendant's specific intent to defraud the public. Because Kincaid-Chauncey has not so argued, we are not presented with the opportunity to decide whether § 1346 also requires private gain.

fraud statute "criminaliz[es] behavior which is not clearly wrongful and which the official could not know was wrongful." She argues that *McCormick* and *Evans*, which established a *quid pro quo* requirement for Hobbs Act color of official right extortion prosecutions, require a similar result here; otherwise, numerous relatively innocuous acts would be swept into the statute's reach. We agree that a limiting principle needs to be identified for § 1346 prosecutions. And we agree that a *quid pro quo* requirement may be a useful limiting principle for some theories of honest services fraud prosecution. However, we do not believe that a *quid pro quo* should be required in all § 1346 prosecutions; in fact, imposing a *quid pro quo* requirement on all § 1346 cases risks being under-inclusive, because some honest services fraud, such as the failure to disclose a conflict of interest where required, may not confer a direct or easily demonstrated benefit. *See United States v. Paranella*, 277 F.3d 678, 692 (3d Cir. 2002).

*McCormick* and *Evans*, while instructive, are clearly not controlling. As we discussed in the previous section, those cases concerned prosecutions under the Hobbs Act for color of official right extortion. Importantly, Hobbs Act extortion is defined as "the obtaining of *property* from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added). Because depriving another of property is a statutory prerequisite to a Hobbs Act violation, the *quid pro quo* requirement goes to the heart of the harm that the Hobbs Act prohibition against color of official right extortion is designed to punish: a public official using his position of power to demand property to which he knows he is not entitled. Like the Hobbs Act, § 1343 also punishes the "obtaining . . . [of] property" through wire fraud. But § 1343 covers a broad range of public and private actions, and depriving another of property is not a necessary element of a § 1343 violation. As Congress made perfectly clear post-*McNally*, it is also a violation of § 1343 "to devise any scheme or artifice to defraud" through the wires, by which

Congress meant to include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Fraud to obtain property is one means of violating § 1343, but it is not the only means for doing so.[14]

**[16]** We have long recognized that the wire fraud statute requires proof of specific intent to defraud. *See, e.g.*, *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980) ("The specific intent requirement [in § 1343] is an aspect of the 'scheme to defraud' requirement; i.e., there is no fraudulent scheme without specific intent."). Moreover, we also recognized pre-*McNally* that to sustain an honest services fraud conviction, "[n]either breach of a fiduciary duty, nor the receipt of secret profits . . . would suffice, standing alone, to show [an honest services fraud] violation." *Id.* Instead, "there must be a recognizable scheme formed with intent to defraud." *Id.* This specific intent requirement for honest services fraud survives *McNally* by virtue of § 1346, *see Williams*, 441 F.3d at 722, and is necessary to distinguish legal conduct from honest services fraud. *See Welch*, 327 F.3d at 1106 ("A scheme where the accused intends to gain property, including money, at the expense of a victim is within the purview of the mail and wire fraud statutes. Yet, the intent to defraud does not depend upon the intent to gain, but rather, on the intent to deprive." (citations omitted)); *Sawyer II*, 239

---

[14]The public's intangible right to honest services cannot be construed as "property" traditionally understood. *See Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001) ("[T]he deprivation of 'honest services' does not constitute concrete financial loss [sufficient to establish an injury to state a RICO claim]."). Although both the Hobbs Act and § 1346 may be used to root out public corruption, a broader problem—violations of fiduciary duties, public or private—animates § 1346. *See, e.g.*, *Williams*, 441 F.3d at 722-23 (citing cases applying § 1346 to private individuals who breach fiduciary duties); *Sawyer II*, 239 F.3d at 39 ("Underlying the applicability of §§ 1341[, 1343,] and 1346 to government officials is the notion that a public official acts as trustee for the citizens and the State . . . and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty to them." (internal quotation marks and citations omitted)).

F.3d at 41, 46-47; *United States v. Sawyer*, 85 F.3d 713, 729-31 & nn.12, 15 (1st Cir. 1996) ("*Sawyer I*").

The political system functions because lobbyists and others are able to persuade elected officials of the wisdom or error of policy proposals. We echo the admonition that "[s]uch endeavors . . . are protected by the right 'to petition the Government for a redress of grievance[s]' guaranteed by the First Amendment of the United States Constitution." *Sawyer I*, 85 F.3d at 731 n.15. Attempts to persuade or mere favoritism, evidenced by a public official's willingness to take a lobbyist's telephone call or give a lobbyist greater access to his appointment schedule, are not sufficient to demonstrate either the lobbyist's or the public official's intent to deprive the public of honest services. *Accord United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-06 (1999) (acknowledging that there are some noncriminal gifts given to public officials in order "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future"). If proof that an individual attempted to influence a public official and that the public official failed to disclose that influence were sufficient to demonstrate a violation of § 1346, every individual who wrote a letter to his member of Congress last year (not to mention every member of Congress who received one) risks becoming a federal felon. This would be an untenable result. The requirement of a specific intent to defraud avoids this outcome.

Although we have rejected Kincaid-Chauncey's invitation to read a *quid pro quo* requirement generally into honest services fraud, we find that her argument has merit in one important instance. The courts have recognized two principal theories of honest services fraud in cases involving public officials: fraud based on a public official's acceptance of a bribe and fraud based on a public official's failure to disclose a material conflict of interest. *See, e.g.*, *Weyhrauch*, 548 F.3d at 1247 ("We are persuaded that Congress' intent in reinstat-

ing the honest services doctrine after *McNally* was to bring at least the two core categories of official misconduct, [(1) taking a bribe or otherwise being paid for a decision while purporting to be exercising independent discretion and (2) nondisclosure of material information,] within the reach of § 1346."); *United States v. Urciuoli*, 513 F.3d 290, 295 n.3 (1st Cir. 2008) ("Typical cases [of honest services fraud] involve votes paid for by bribes or based on private undisclosed financial interests of the legislator . . . or other nondisclosures in relation to official duties."); *Kemp*, 500 F.3d at 279 ("Honest services fraud . . . typically occurs in either of two situations: (1) bribery, where a [public official] was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain." (internal quotation marks and citation omitted; second alteration in original)); *United States v. Brown*, 459 F.3d 509, 521 (5th Cir. 2006) ("[C]ases upholding convictions arguably falling under the honest services rubric can be generally categorized in terms of either bribery and kickbacks or self-dealing."); *Rybicki*, 354 F.3d at 139-41 (categorizing honest services fraud case as either "bribery" or "self-dealing"); *Sawyer II*, 239 F.3d at 46 (stating that the elements of honest services fraud are satisfied if government proves "either that [the defendant] intended to improperly influence a public official in her duties, or that he intended for public officials to fail to disclose a conflict of interest"); *Woodward*, 149 F.3d at 57 ("[T]wo of the ways that a public official can steal his honest services from his public employer [include] (1) the official can be influenced or otherwise improperly affected in the performance of his duties; or (2) the official can fail to disclose a conflict of interest, resulting in personal gain."); *see also Sorich*, 523 F.3d at 707 ("[I]n most honest services cases, the defendant violates a fiduciary duty in return for cash-kickbacks, bribes, or other payments."); *United States v. Jennings*, 487 F.3d 564, 577 (8th Cir. 2007) (upholding honest services fraud conviction on failure to disclose conflict of interest theory); *United States v. Hasner*, 340 F.3d 1261, 1272

(11th Cir. 2003) ("A government official may be guilty of honest services fraud if he withholds material information."); *United States v. deVegter*, 198 F.3d 1324, 1327-28 (11th Cir. 1999) ("[T]he paradigm case of honest services fraud is the bribery of a public official . . . .").

**[17]** When the government's theory is that a public official accepted money in exchange for influence, we agree that at least an implicit *quid pro quo* is required. *See Kemp*, 500 F.3d at 281-82. This requirement is necessary to ensure that the defendant had the requisite intent to defraud and to avoid convicting people for having the "mere intent to curry favor." *Id.* at 281. Without a link between the item of value received and an understanding that the public official receiving it is to perform official acts on behalf of the payor when called upon, there is no discernible way to distinguish between an elected official responding to legitimate lobbying and a corrupt politician selling his votes to the highest bidder. The Supreme Court has rejected such broad theories of criminal liability in a similar context. *See Sun-Diamond Growers*, 526 U.S. at 404-05, 408 (requiring a link between receipt of an illegal gratuity and an official act in order to sustain conviction for violating the gratuity statute, 18 U.S.C. § 201(c), lest "the giving of gifts by reason of the recipient's mere tenure in [public] office constitute[ ] a violation").

**[18]** Like the *quid pro quo* requirement for Hobbs Act extortion under color of official right charges, the *quid pro quo* necessary for a bribery honest services fraud conviction need not be explicit, and the district court need not use the words "*quid pro quo*" when it instructs the jury so long as the essential idea of give-and-take is conveyed. *See Giles*, 246 F.3d at 973. Nor need the implicit *quid pro quo* concern a specific official act. *See Kemp*, 500 F.3d at 282 ("[T]he government need not prove that each gift was provided with the intent to prompt a specific official act."); *accord United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) ("The quid pro quo requirement is satisfied so long as the evidence shows

a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor." (internal quotation marks omitted)).[15] Other theories of honest services fraud—for example, when a government official violates a conflict of interest disclosure requirement—do not require a *quid pro quo* because they are sufficiently limited by the specific intent requirement that we have long recognized in all mail and wire fraud prosecutions. *See also United States v. Selby*, ___ F.3d ___, 2009 WL 102711, at *9 (9th Cir. January 15, 2009) (upholding conviction of honest services wire fraud based on a conflict of interest in violation of 18 U.S.C. § 208).

2

We now apply these principles to the facts of this case. The district court instructed the jury on the wire fraud counts[16] as follows:

---

[15] It is sufficient, for example, if the evidence establishes that the government official has been put on "retainer"—that is, that the government official has received payments or other items of value with the understanding that when the payor comes calling, the government official will do whatever is asked. Only individuals who can be shown to have had the specific intent to trade official actions for items of value are subject to criminal punishment on this theory of honest services fraud. The retainer theory of *quid pro quo* eliminates the possibility that an innocent lobbyist or politician will be convicted for depriving the public of honest services.

The Third and First Circuits have both explicitly approved such "retainer" theories of honest services fraud, although they called them by different names. *See Kemp*, 500 F.3d at 282 ("[W]e agree with the government that the District Court's instruction to the jury that it could convict upon finding a 'stream of benefits' was legally correct."); *Sawyer I*, 85 F.3d at 730 ("[A] person with continuing and long-term interests before an official might engage in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services."); *see also Jennings*, 160 F.3d at 1014 (stating, in a federal bribery case, that the *quid pro quo* requirement is satisfied if "payments [are] made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf").

[16] For the campaign contributions alleged as acts in furtherance of the honest services fraud scheme, the district court gave an explicit *quid pro quo* instruction, which Kincaid-Chauncey does not challenge as inadequate.

> In order for a defendant to be found guilty of [wire fraud], the Government must prove each of the following elements beyond a reasonable doubt.
>
> First, the defendant made up or knowingly participated in a scheme or plan to deprive the Clark County Board of County Commissioners and the citizens of Clark County of their right to honest services.
>
> Second, the defendant acted with the intent to deprive the Board of County Commissioners and the citizens of Clark County of their right to honest services.
>
> And, third, the defendant transmitted, or caused someone to transmit, a wire communication in interstate commerce to carry out or to attempt to carry out the scheme or plan. . . .
>
> What must be proved beyond a reasonable doubt is that the defendant, with intent to defraud, knowingly and willfully devised, intended to devise, or participated in a scheme to defraud substantially the same as the one alleged in the indictment.

These instructions appropriately directed the jury's attention to the issue of intent to defraud. The instructions state that Kincaid-Chauncey could not be found guilty unless she "made up or knowingly participated in a scheme or plan" to deprive the County or its citizens "of their right to honest services." The instructions repeat that Kincaid-Chauncey must have "acted *with the intent to deprive* the Board of County Commissioners and the citizens of Clark County *of their right to honest services*." (emphasis added). The instructions go on to say that the government must prove beyond a reasonable doubt "that the defendant *with intent to defraud*, knowingly

and willfully devised, intended to devise, or participated in a scheme to defraud." (emphasis added).

The instructions then proceed to define what it means to intend to defraud the public of honest services:

> Public officials inherently owe a duty to the public to act in the public's best interest. If, instead, the official accepts something of value with an intent to be influenced, the official has defrauded the public of the official's honest services even though no tangible loss to the public has been shown because the public official deprived the public of its right to honest and faithful government.

> In addition, when an official acting with the intent to defraud, fails to disclose a personal interest in a matter over which he or she has decision-making power, the public is deprived of its right to honest services because it is deprived of its right either to disinterested decision making itself or full disclosure as to the official's motivation behind an official act. It is not enough for the Government to prove that the defendant failed to disclose such a conflict of interest. Rather, the Government must prove that the defendant acted with the intent to defraud. The Government proves intent to defraud if it proves that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension. A public official's duty to disclose material information need not be expressly imposed by statute or code because a public official inherently owes a fiduciary duty to the public to make governmental decisions in the public's best interest.

> The focus of honest services fraud is on the fraudulent and deceptive conduct of the public official who abuses a position of trust, and the Government is not

> required to link any particular payment to a specific
> act on the part of the public official.

This instruction permitted the jury to find that Kincaid-Chauncey defrauded the public of her honest services on one of two theories: that she accepted something of value with the intent to be influenced or that she failed to disclose a conflict of interest and thereby intended to defraud the public. We must reverse Kincaid-Chauncey's convictions for honest services fraud if the instructions regarding either of those two theories stated the necessary elements inaccurately, *Martinez v. Garcia*, 379 F.3d 1034, 1040 (9th Cir. 2004), and the error was not harmless, *Neder v. United States*, 527 U.S. 1, 9 (1999).

The first theory permitted a finding of guilt only if the jury found that Kincaid-Chauncey "accept[ed] something of value with an intent to be influenced." Because this is a bribery theory of prosecution, the intent to defraud must have been shown at least through an implicit *quid pro quo*. The intent element described in this instruction is rather thin; if given in isolation, this instruction might well be inadequate to ensure that the jury found that Kincaid-Chauncey had acted with the intent to defraud. Two factors, however, prevent us from reaching that conclusion.

First, the instructions do not permit the jury to convict a defendant simply for having the "intent to be influenced." Instead, the defendant needed to "accept something of value" in conjunction with that intent. Though the district court specifically stated that "the Government is not required to link any particular payment to a specific act on the part of the public official," this instruction is not very different from the implicit *quid pro quo* instruction we just approved in connection with the Hobbs Act charges against Kincaid-Chauncey. The Hobbs Act instruction stated: "[T]he Government does not have to prove an explicit promise to perform a particular act made at the time of the payment. Rather, it is sufficient if

the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence as specific opportunities arise." There is little distance between the knowledge that a payment creates an expectation to "exercise particular kinds of influence" and the intent to be influenced, motivated by the receipt of something of value.

**[19]** The district court's instruction that "the Government is not required to link any particular payment to a specific act on the part of the public official," contrary to Kincaid-Chauncey's argument, did not remove the necessary link between the receipt of the item of value and the intent to be influenced. The Third Circuit has used nearly identical language to describe the "stream of benefits" theory of honest services fraud. *See Kemp*, 500 F.3d at 282 ("[T]he government need not prove that each gift was provided with the intent to prompt a specific official act."). This instruction, though thin, was sufficient to convey the idea of an implicit *quid pro quo*.

**[20]** Second, we are required to review the jury instructions as a whole, *Frega*, 179 F.3d at 806 n.16, and the instructions here contain numerous references to the specific intent to defraud the public, which strengthen the *quid pro quo* element in the instructions. For example, the district court cautioned the jury that "[a] public official does not commit honest services fraud if his or her intent was limited to the cultivation of a personal, business, or political friendship." Rather, the official must have had an intent "to be improperly influenced in his or her official duties." The jury was also instructed that "[a] public official's receipt of hospitality does not defraud the public of its right to honest services unless the public official accepts such hostility [sic] with the intent to be influenced or to deceive the public." The instructions required that the jury focus on "the fraudulent and deceptive conduct of the public official who abuses a position of trust." To satisfy the specific intent to defraud, the instructions required the government to prove beyond a reasonable doubt "that the scheme

was reasonably calculated to deceive persons of ordinary prudence and comprehension." The jury thus could not convict for mere influence or political friendships. *Accord Kemp*, 500 F.3d at 281-82 (approving an instruction that "left no danger that the jury would convict upon merely finding that [the defendants] provided benefits to [a public official] in a general attempt to curry favor or build goodwill"). Instead, conviction required "fraudulent and deceptive conduct." Thus, while the instructions stated that all a finding of guilt required was receipt of an item of value coupled with an intent to be influenced, the rest of the instructions prevented a conviction based on the type of legitimate "influence" that is necessary to the functioning of any political system. The district court did not use the words "*quid pro quo*," but the instructions, on the whole, adequately conveyed "the idea that 'you get something and you give something.' " *Giles*, 246 F.3d at 973. Because the instructions, taken as a whole, contained an implicit *quid pro quo* requirement, they adequately stated the elements of honest services fraud on a bribery theory.

**[21]** The second theory on which the jury instructions permitted a finding of guilt on the honest services fraud counts was the failure to disclose a conflict of interest. This portion of the instruction specifically notes that the mere failure to disclose a conflict of interest is inadequate, but that the government must also prove that Kincaid-Chauncey acted with the specific intent to defraud in her failure to disclose a conflict of interest. The instruction permitted conviction if "the public official participated in the matter without disclosing her conflict of interest, provided that the non-disclosure was coupled with an intent to defraud." The instruction thus required that Kincaid-Chauncey satisfy the requisite mental state for an honest services fraud conviction based on a non-disclosure theory. As we stated above, this theory of honest services fraud does not require demonstration of a *quid pro quo* to prove the required intent to defraud.[17]

---

[17]Again, Kincaid-Chauncey has not argued that the failure to disclose a conflict of interest theory of honest services fraud also requires a violation of a specific, applicable conflict of interest or disclosure requirement, or personal gain, so we do not decide whether it does.

**[22]** We conclude that the instructions adequately stated the elements of § 1346 for both theories of prosecution.

### III

The judgment of conviction is AFFIRMED.

---

BERZON, Circuit Judge, concurring:

I agree with the majority's conclusion that a *quid pro quo* requirement is not necessary to all § 1346 prosecutions. I also agree that, because Kincaid-Chauncey appeals only the lack of a *quid pro quo* instruction, the question of whether a § 1346 prosecution also requires a showing of private gain or a violation of a specific conflict of interest disclosure standard is not properly before us. *See* Maj. Op. at 1998-99 n.13. And I recognize that our recent decision in *United States v. Weyhrauch*, 548 F.3d 1237, 1248 (9th Cir. 2008), would compel the conclusion that a violation of a state law disclosure requirement is not *necessary* to sustain an honest services fraud conviction, had that specific question properly been before us here. I write separately, however, to express my view that where the government's § 1346 theory rests on a defendant's failure to disclose a conflict of interest, reference to *some* well-defined external disclosure standard, expressed in state law *or* elsewhere, is necessary to limit an otherwise amorphous standard for criminal liability. Proving a specific intent to defraud — which, in my view, always includes an intent to deceive — is a necessary element of an honest services fraud prosecution, but is not sufficient as a limiting principle in the conflict of interest context. For, particularly where public officials are the target of such prosecutions, vague or amorphous disclosure requirements risk political misuse and manipulation.

A public official's failure to disclose a material interest in a matter over which the official exercises discretionary

decision-making power may fall within the scope of § 1346, as several courts of appeal have recognized. *See, e.g.*, *United States v. Jennings*, 487 F.3d 564, 577 (8th Cir. 1997); *United States v. Woodward*, 149 F.3d 46, 63 (1st Cir. 1998); *United States v. Antico*, 275 F.3d 245, 262-63 (3d Cir. 2001). An official's decision that tacitly favors private interests can undermine the public's right to the official's honest services and can threaten the integrity of the political process. *See United States v. Panarella*, 277 F.3d 678, 692 (3d Cir. 2002) ("[N]on-disclosure of a conflict of interest in a fiduciary setting falls squarely within the traditional definition of fraud, and poses a . . . threat to the integrity of the electoral system . . . ."). But recognizing that a broad type of conduct may give rise to criminal liability does not specifically define it. As courts confronting this issue have recognized, "some conflicts of interest are tolerable," *United States v. Bloom*, 149 F.3d 649, 654 (7th Cir. 1998), and not every violation of a fiduciary duty should be criminal. *United States v. Welch*, 327 F.3d 1081, 1107 (10th Cir. 2003). Thus, as the majority observes, the broad nature of § 1346 has left courts to search for a limiting principle, one that would separate illicit behavior from more innocuous behavior that Congress did not intend to make a federal crime. *See* Maj. Op. at 1998 (citing *United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008)).

Although the need for a limiting principle is apparent in all § 1346 prosecutions, more precise specification is of particular importance where the government's theory of honest services fraud rests on a failure to disclose an alleged conflict of interest. As an initial matter, ascertaining what constitutes a conflict of interest — or whether a particular interest is sufficiently material to warrant disclosure — is not necessarily a self-evident determination. True, in some cases, such as the failure to disclose a substantial personal investment in a company receiving favorable legislative treatment, it is reasonably clear that such conduct would satisfy any meaningful definition of "conflict of interest" and falls well within what Congress likely meant by a deprivation of the public's "intangible

right to honest services." *See Jennings*, 487 F.3d at 654 (upholding conviction where legislator-defendant personally guaranteed $670,000 in loans to company receiving a grant).

But other cases are much less clear-cut. Determining whether a particular relationship rises to the level of an improper conflict of interest can involve judgment calls that implicate subjective notions of morality and professional ethics. For this reason, statutes governing public employees and codes of professional ethics do not speak in general terms about the conflicts that can lead to the imposition of criminal liability or disciplinary sanctions. Rather, such requirements are spelled out in great detail. *See, e.g.*, Cal. Gov't Code §§ 87100-03 (regulating conflicts of interest for public employees); Model Rules of Prof'l Conduct R. 1.7-1.11 (governing conflicts of interest in the client-lawyer relationship).

Naturally, because separating permissible conduct from impermissible conduct can be an exercise in line drawing, different jurisdictions reach varying conclusions with respect to conduct that triggers conflict of interest rules. For example, in some instances, regulations seemingly prohibit public officials from participating in actions that implicate *any* of their personal financial interests, whereas others provide a floor of permissible financial interest before liability attaches. *Compare, e.g.*, Ga. Code Ann. § 45-10-3(9) (prohibiting a public official from "tak[ing] any official action with regard to any matter under circumstances in which he knows or should know that he has a direct or indirect monetary interest in the subject matter of such matter or in the outcome of such official action"), *with* Cal. Gov't Code § 87103(a) (allowing such activity where the official has less than $2000 invested in an interested business). Moreover, although it appears intuitively obvious that a prohibition against self-interested transactions might also extend to transactions in which immediate family members have an interest, it is less obvious who counts as "immediate family." Jurisdictions reach different conclusions on this factor as well. *Compare, e.g.*, Cal. Gov't Code

§ 82029 (defining "immediate family" as one's "spouse and dependent children"), *with* D.C. Code § 1-1106.01(i)(5) (defining "immediate family" as the "spouse or domestic partner and any parent, brother, or sister, or child of the public official, and the spouse or domestic partner of any such parent, brother, sister, or child").

The point is not to dwell on the minutia or merits of various conflict of interest regulations, but rather to illustrate that it is often not readily apparent whether a problematic conflict of interest exists and therefore whether an official's failure to disclose such information should or should not give rise to criminal liability. Without reference to *some* external disclosure standard, § 1346 could well impose criminal liability on activity that offends some people's subjective sense of impermissible private entanglement, but may appear to others not to involve any conflict of interest. *Cf. Paranella*, 277 F.3d at 698 (observing that characterizations of fraud as "a broad concept that is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play" do not "allay fears that the federal fraud statutes give inadequate notice of criminality" (internal quotations omitted)). Moreover, it is also unclear what mitigating steps an official might take that could render the conflict sufficiently immaterial to avoid disclosure.

Furthermore, resolving what constitutes an impermissible conflict of interest does not solve all of the ambiguity presented by § 1346 prosecutions. The fraud inheres not in the conflict itself, but in the failure to disclose it — "[a]n official's intentional violation of the duty to disclose provides the requisite deceit." *Woodward*, 149 F.3d at 63 (internal quotation omitted). But again, it is not self-evident what adequate disclosure means in any given case. How should disclosure be made? To whom is disclosure owed? Courts elaborating the conflict of interest theory of honest services fraud typically observe that employees owe duties of disclosure to their

employers, *see United States v. Rybicki*, 354 F.3d 124, 140 (2d Cir. 2003) (en banc), and, in the case of public officials, to the public. *See Paranella*, 277 F.3d at 697 ("[D]isclosure laws permit the public to judge for itself whether an official has acted on a conflict of interest."). However, without more, observing that a duty of disclosure is owed does not necessarily inform the conduct that would satisfy the disclosure requirement in any given case. Is it sufficient that a public official note the conflict at the time of the vote? In advance? Must the conflict be widely publicized, or will a notation in an obscure public record suffice? Is disclosure always an adequate antidote, or is the official's recusal necessary in some circumstances?

Without a reference to external disclosure standards, the conflict of interest theory of honest services fraud risks imposing a dangerously amorphous standard of criminal liability. Courts have long been concerned that the mail fraud statute's potentially broad scope could give insufficient notice of criminal liability and lead to the creation of federal common law crimes. *See Sorich*, 523 F.3d at 707-08 ("[G]iven the amorphous and open-ended nature of § 1346, . . . courts have felt the need to find limiting principles . . . [to reduce] the risk of creating federal common law crimes . . . ."); *United States v. Brumley*, 116 F.3d 728, 746 (5th Cir. 1997) (Jolly & DeMoss, JJ., dissenting) ("[A]d hoc definitions cannot possibly satisfy the requirements of 'fair notice' to our fellow citizens as to where the line between permitted and prohibited conduct is drawn.").

The stakes are considerably higher in the case of public officials. The lack of statutory specification can give rise to selective prosecution and political misuse. *See* Thomas M. DiBiagio, *Politics and the Criminal Process: Federal Public Corruption Prosecutions of Popular Public Officials Under the Honest Services Component of the Mail and Wire Fraud Statutes*, 105 Dick. L. Rev. 57, 57-58 (2000) ("With no established standards, a federal public corruption prosecution,

based on the intangible right to honest services, is particularly vulnerable to being snarled by politics."); *see also United States v. Margiotta*, 688 F.2d 108, 143 (2d Cir. 1982) (Winter, J., dissenting) ("It may be a disagreeable fact but it is nevertheless a fact that political opponents not infrequently exchange charges of 'corruption,' 'bias,' 'dishonesty,' or deviation from 'accepted standards of . . . fair play and right dealing.' Every such accusation is now potentially translatable into a federal indictment." (alteration in the original)). As the Third Circuit observed, "[d]eprivation of honest services is perforce an imprecise standard, and rule of lenity concerns are particularly weighty in the context of prosecutions of political officials, since such prosecutions may chill constitutionally protected political activity." *Paranella*, 277 F.3d at 698. The conflict of interest theory, unhinged from an external disclosure standard, places too potent a tool in the hands of zealous prosecutors who may be guided by their own political motivations. Prosecutors might also feel political pressure to pursue certain state or local officials; there may be no sufficient constraint without reference to an external disclosure standard.

Finally, requiring a "specific intent to defraud" cannot always function as a sufficient limiting principle — one that would effectively prevent such political misuse — in the absence of a well-specified and commonly understood notion of when non-disclosure amounts to "fraud." One can certainly intend to withhold a particular piece of information, but it is nearly meaningless to say that such a withholding was done with the specific intent to deceive if there is no extrinsic standard governing whether the disclosure was required in the first place. Requiring a "specific intent to defraud" is *necessary* to satisfy the mental state required under the mail fraud statute, but determining whether that element is satisfied also requires reference to some external source of disclosure obligations.

Our recent decision in *Weyhrauch* held only that the government need not prove a violation of a state law disclosure

requirement to sustain an honest services fraud conviction. 548 F.3d at 1248. We declined to adopt a state law limiting principle out of concern that requiring a violation of state law would "limit[ ] the reach of the federal fraud statutes only to conduct that violates state law," *id.* at 1245, and would thereby constrain Congress's ability to protect federal interests to the independent decisions of the states. *Id.* at 1246. That is, we rejected the idea that state law could supply the sole source of conflict of interest disclosure obligations. But because the conduct at issue in that case fell "comfortably within" either a bribery *or* conflict of interest theory of honest services fraud, including, notably, strong evidence of a *quid pro quo* arrangement, we had no occasion to define what an appropriate limiting principle would be. *Id.* at 1247.

I therefore concur in the majority opinion only because the challenge to the honest services fraud instruction did not encompass the concerns explored in this concurrence. Had the issue been raised, I would have agreed with the Third Circuit that the government must prove a violation of an externally established conflict-of-interest-based disclosure standard.