RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0095p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TERRANCE CRAIG,

*Defendant-Appellant*.

⎱ No. 19-3278

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:18-cr-00198-1—Donald C. Nugent, District Judge.

Argued: January 29, 2020

Decided and Filed: March 27, 2020

Before: MERRITT, CLAY, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Christian J. Grostic, FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for
Appellant. Michael A. Sullivan, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio,
for Appellee. **ON BRIEF:** Christian J. Grostic, FEDERAL PUBLIC DEFENDER, Cleveland,
Ohio, for Appellant. Brian S. Deckert, UNITED STATES ATTORNEY'S OFFICE, Cleveland,
Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

JOHN K. BUSH, Circuit Judge. A criminal conviction must rest only on admissible
evidence. Today, we hold that the Government cannot elide this bedrock principle of our justice
system by publishing for the jury an unadmitted exhibit under the guise of impeachment.

Terrance Craig was involved in a high-speed shootout in the streets of Akron, Ohio and was apprehended wearing a shoulder holster and with gunshot residue on his hands. His DNA was identified on a firearm discovered in the backseat of one of the vehicles. Craig was charged with being a felon in possession of a firearm and took the case to trial. Craig admitted that he possessed a firearm while being a felon but testified that he possessed the gun only long enough to defend himself and his friends during the firefight. On cross-examination, the Government played for the jury a video depicting a masked individual it alleged to be Craig rapping and wielding a firearm that was similar to the gun for which he was charged. Craig denied that he was the masked individual in the video, and the Government did not attempt to introduce the video into evidence. The district court never issued a limiting instruction about whether or how to consider the video, and the Government referenced the video in closing arguments.

Because the Government had no legal basis to publish the unadmitted and unauthenticated exhibit to the jury, and because the error was not harmless, we **VACATE** Craig's judgment of conviction and **REMAND** for a new trial.

**I.**

On November 26, 2017, Terrance Craig was arrested after firing a gun from a moving vehicle in which he was a passenger. That morning, two police officers, Officer Darrick Ball and Officer Joshua Rivers, had heard gunshots while sitting in the parking lot of a local high school. Officer Rivers drove east to identify the source of the gunshots and observed a gold SUV driving past him. He activated his lights and pursued the SUV, but it continued at a high rate of speed, running through two red lights and a stop sign.

The vehicle finally came to a stop, at which point an individual that the officers knew to be Craig exited the vehicle. Officer Rivers testified that Craig briefly returned to the vehicle to throw a black object into the backseat, but Craig testified that this did not occur.

Craig then fled on foot and jumped over a chain-link fence before he was caught by Officer Rivers. Craig was wearing a shoulder holster underneath his jacket when he was apprehended. Officer Ball transported Craig to the police station, and Ball commented that he had seen a rap video on Facebook which, according to Ball, depicted Craig rapping and holding a

firearm with an extended magazine. When Officer Ball asked about the extended magazine in the video, Craig responded that he rarely saw extended-magazine guns, and that they are for show and usually jam.

Officers later surveyed the abandoned SUV and discovered bullet holes in the rear of the vehicle. In the backseat, officers located a 9mm firearm with an extended magazine with a shell casing jammed in the chamber. Also inside the SUV, officers recovered seven 9mm shell casings that had been discharged from the extended-magazine firearm, as well as a .45 caliber bullet. According to Craig, the bullet had been fired from the other vehicle during the shootout, as had several other .45 caliber bullets that struck surrounding houses.

Craig was charged with one count of possessing a firearm and ammunition after a felony conviction under 18 U.S.C. § 922(g). At trial, the Government introduced evidence from its gunshot residue expert indicating that Craig had either discharged a firearm or had been near a firearm which was discharged, as well as DNA evidence that Craig's DNA was on the firearm located in the back of the SUV.

Officers Ball and Rivers both testified at trial about the shootout and Craig's arrest. Officer Ball testified about a Facebook rap video he had seen. He claimed that Craig was in the video wearing the same jacket that he wore when arrested. According to Officer Ball, Craig stated in the video that he "wasn't turning himself in until he catch [sic] some bodies." R. 46 at PageID 268. Officer Rivers also testified that he had seen a video on Facebook with Craig rapping and in the same jacket that he was wearing upon arrest. The Government did not seek to introduce the video into evidence, nor did it show the video to Officer Ball, Officer Rivers, Craig, or the court during the officers' testimony.

Craig did not dispute that he was a felon or that he possessed a firearm. Instead, he asserted that he was justified in possessing the firearm and testified in support of this claim. Craig testified that he was riding in the backseat of the SUV without a firearm when another vehicle made a sudden U-turn and began chasing and shooting at Craig and his friends. Craig testified that the driver, whom he identified as "Booty," removed the shoulder holster from himself and handed it to Craig, instructing him to return fire in defense. Craig testified that he

put on the holster, removed the firearm, and returned fire over his head and out the side window in an attempt to ward off the attackers.

Before Craig took the stand, the Government had indicated it would seek to impeach Craig on cross-examination with a video depicting a masked individual rapping and wielding a firearm. Craig's counsel objected because the video was unauthenticated, the individual in the video was wearing a mask and could not be identified, and the video was more prejudicial than probative. The Government responded that it was justified in using the video because two officers testified that they had observed a Facebook video of a person they believed to be Craig wearing the same jacket and holding the firearm for which Craig was arrested. The following colloquy between the court and Mr. Deckert (for the Government) then occurred:

> The Court: So the person [in the video] has a mask on?
>
> Mr. Deckert: Covering part of his face, Your Honor.
>
> The Court: Well, you can use it.

R. 47 at PageID 405.

During cross-examination, Craig testified that he had never seen a firearm with an extended magazine in his personal life. The Government asked if Craig had ever done raps, to which he responded affirmatively. Over Craig's objection, the Government then played for the jury a rap video depicting a masked individual rapping while holding an extended-magazine firearm. When asked by the Government if he was the masked individual, Craig replied no. In response to Craig's denial, the Government did not seek to have the video admitted into evidence as an exhibit, and the court did not issue any instructions to the jury about whether or how to consider the video.

Despite that the video was not in evidence, the Government made pointed reference to it during closing arguments, stating:

And how do you know that he had that gun before, that he had that gun before he got in the car on November 26th? Because you saw it. You saw the Facebook video and you saw him with the gun, waving the gun around, and it looks just like this gun. And he said on cross-examination that that wasn't him in the Facebook video. Do you remember that?

*Id.* at PageID 488.

The jury received its instructions and retired to deliberate. During deliberations, the only thing the jury asked was to see the rap video again. The Government informed the court that the video "was not introduced," but was "just used on cross." *Id.* at PageID 499. The court then brought out the jurors and informed them that "[t]he rap video is not admitted into evidence, so what you have to do is just call into your recollection of that." *Id.* at PageID 500. The court did not give any other instructions about whether or how to consider the video. The jury then returned a verdict of guilty.

At sentencing, the Government requested a four-level enhancement under section 2K2.1(b)(6)(B) of the Guidelines for "use[] or possess[ion of] any firearm or ammunition in connection with a felony offense." Specifically, the Government alleged that Craig committed a felony by discharging a firearm over a public road in violation of Ohio Revised Code section 2923.162(A)(3) and (C)(2).[1] The court found that Craig had discharged a firearm over a public road, creating a substantial risk of physical harm because he "admitted that in his testimony, that he did that." R. 64 at PageID 599.

Craig's counsel then objected because the district court had not considered whether Craig acted in self defense when he violated section 2923.162(A)(3). He argued that Craig discharged a firearm over a public road because another vehicle was chasing and shooting at him and his friends. The district court rejected this argument:

---

[1]Subsections 2923.162(A)(3) and (C)(2) define as a felony "[d]ischarg[ing] a firearm upon or over a public road or highway" when doing so "create[s] a substantial risk of physical harm to any person or cause[s] serious physical harm to property." Ohio Rev. Code Ann. § 2923.162(A)(3), (C)(2). The Government also sought this enhancement on the basis that Craig committed felonious assault, *id.* § 2903.11(A)(2), discharged a weapon at or into an occupied structure or a school safety zone, *id.* § 2923.161(A)(1)–(2), and operated a motor vehicle so as to willfully elude or flee a police officer, *id.* § 2921.331(B). The district judge applied the four-level enhancement because it found that Craig had discharged a firearm over a public road and created a substantial risk of physical harm, so it did not consider the other offenses.

[T]he testimony in the trial was a little bit different.  It was not resolved one way or the other who commenced the shooting, whether it was Craig's car or Craig himself or the other car or how that exactly occurred.  But based upon everything I had before me, I think it's pretty clear that [section 2923.162(A)(3)] applies.

*Id.* at PageID 600.  The court went on to state "I'm going to add too, I don't want to get into too much detail about judging credibility, but Mr. Craig's story clearly wasn't believed by the jury, and just the idea of handing the holster over and things like that were pretty incredible statements." *Id.* at PageID 601.

Applying the four-level enhancement produced an advisory Guideline range of 110 to 120 months in prison, and the court sentenced Craig to 110 months to be served consecutively with two state sentences.

Craig appealed.  He first contends that the court erred by allowing the Government to play the rap video for the jury because it was not authenticated.  He also argues that the district court erred because it applied the four-level sentencing enhancement without considering whether Craig acted in self defense.

**II.**

We review the district court's evidentiary rulings, including rulings on whether a given piece of evidence was properly authenticated, for abuse of discretion.  *See United States v. Morales*, 687 F.3d 697, 701–02 (6th Cir. 2012); *United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004).

To authenticate an exhibit, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  The proponent must provide sufficient evidence "so that a reasonable juror could find in favor of authenticity or identification." *United States v. Jones*, 107 F.3d 1147, 1150 n.1 (6th Cir. 1997) (quoting Jack B. Weinstein et. al., *Weinstein's Evidence Manual* ¶ 901(a) [01], at 901–19 (5th ed. 1996)); *see also United States v. Thomas*, 701 F. App'x 414, 418 (6th Cir. 2017).

Craig argues that the district court erred by allowing the Government to play to the jury the video of a masked individual rapping and holding a firearm.  The error occurred, Craig

contends, because the video was never authenticated.   Specifically, he argues that the Government failed to introduce evidence that Craig was the masked individual in the video or that this was the video about which the officers testified.  We agree that the court erred in allowing the video to be played to the jury without its admission into evidence.

The Government never attempted to authenticate the video, and Craig, the only witness to whom the video was shown, denied that he was the masked individual.  The Government never showed the video to either Officer Rivers of Officer Ball during its case in chief, and it never attempted to establish that the video the jury saw was the same video they had seen.  The video therefore was unauthenticated.

The Government does not claim it ever authenticated the video, but contends that it did not need to do so because the video was used to cross-examine Craig under Federal Rule of Evidence 608(b) and was not introduced into evidence as an exhibit.  Rule 608(b) provides:

> Except for a criminal conviction . . . , extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.  But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about.

We have explained that there must be a "'good faith basis' for cross-examination under Rule 608(b)." *United States v. Zidell*, 323 F.3d 412, 426 (6th Cir. 2003).  In other words, a questioner may ask about specific instances of conduct to attack a witness's credibility, but only if the questioner has a good faith basis that the instance actually occurred.  The Government accordingly contends that it needed only a "good faith basis" to believe that Craig was the individual in the rap video to allow it to show the video to Craig and the jury.

The Government's reliance on Rule 608(b) is unavailing.  As an initial matter, as Craig points out, Rule 608(b) by its terms prohibits the use of extrinsic evidence.  Under that Rule, we have allowed a questioner to ask about extrinsic documents during cross-examination and show them to the witness, but not to publish the documents to the jury. *See United States v. Delaine*, 517 F. App'x 466, 470 (6th Cir. 2013) ("The checks that Defendant now claims should have been excluded were never admitted into evidence. The jury did not see them, nor were they

available to the jury during deliberations.").  So, although the Government may have been permitted to show Craig the video and question him about it, Rule 608(b) did not authorize playing the video to the jury.  *See id.*; *see also* Roger Park & Tom Lininger, *The New Wigmore: A Treatise on Evidence: Impeachment and Rehabilitation* § 2.3 (1st ed. Supp. 2020) ("Inadmissible evidence [can] provide the good-faith basis for cross-examination. . . .  Of course, the prosecution could not make that inadmissible evidence known to the jury under the guise of providing a good-faith basis for impeachment.").

Accordingly, and unsurprisingly, none of the Rule 608(b) cases upon which the Government relies involve extrinsic evidence such as documents or videos.  *See United States v. Gaines*, 105 F. App'x 682, 695 (6th Cir. 2004) (noting that to prevail, the defendant "must show that the prosecutor lacked a 'good faith basis' for *asking the questions*" (emphasis added)), *vacated on other grounds*, 543 U.S. 1114 (2005); *Zidell*, 323 F.3d at 425 ("Defendant asserts that he was deprived of a fair trial when the Government *inquired during his cross-examination*, allegedly without any factual basis, whether he had attempted to secure a witness's false testimony on his behalf." (emphasis added)).[2]

The Government's reliance on Rule 608(b) is also flawed because this rule by its terms does not apply to the impeachment at issue.  It permits impeachment about "specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  Fed. R. Evid. 608(b).  But, the video at issue depicts a masked individual performing a rap and holding a firearm, which has nothing to do with character for truthfulness.  *Cf. Zidell*, 323 F.3d at 426 (finding questions about an attempt to suborn perjury to be proper cross-examination under 608(b) because they beared on the witness's "character for truthfulness").

Likely recognizing these difficulties, the Government at oral argument described its use of the video as a hybrid of Rule 608(b) and Rule 613, which concerns impeachment by prior

---

[2]Some courts have permitted the introduction of extrinsic evidence to prove specific instances of conduct that demonstrate a character for truthfulness if the witness admits to the conduct.  *See United States v. Zandi*, 769 F.2d 229, 236 (4th Cir. 1985) ("[C]ourts generally hold that when a witness *admits* to having performed certain acts . . . the prohibition against using extrinsic evidence is not applicable."); *Carter v. Hewitt*, 617 F.2d 961, 970 (3d Cir. 1980) (same).  This approach does not seem consistent with the language of Rule 608(b) but, in any event, we need not consider its merit.  Craig of course denied he was the individual in the video.

inconsistent statement. Rule 613 also does not help the Government. Although extrinsic evidence may be used for impeachment by prior inconsistent statement, such extrinsic evidence must still be authenticated. *See United States v. Harris*, 881 F.3d 945, 949 (6th Cir. 2018) (finding a prior inconsistent statement admissible because it "met the requirements of Rule 901(a)"); *see also United States v. Isiwele*, 635 F.3d 196, 199–201 (5th Cir. 2011) (same). We find no merit in the Government's attempt to get around this requirement by substituting in the "good faith" standard from Rule 608(b), which by its own terms governs questioning, not evidence.

Instead, what the Government describes as a hybrid of Rule 608(b) and Rule 613 appears to be common-law impeachment by specific contradiction, which "permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence." *United States v. Kincaid-Chauncey*, 556 F.3d 923, 932 (9th Cir. 2009) (quoting *United States v. Castillo*, 181 F.3d 1129, 1132 (9th Cir. 1999)), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010). Although impeachment by specific contradiction is not explicitly contemplated in the Federal Rules of Evidence, federal courts have permitted this type of impeachment. *See, e.g.*, *United States v. Gilmore*, 553 F.3d 266, 271–72 (3d Cir. 2009); *United States v. Perez-Perez*, 72 F.3d 224, 227 (1st Cir. 1995); 1 Kenneth S. Broun et al., *McCormick on Evidence* § 45 (8th ed. Supp. 2020); *see also United States v. Markarian*, 967 F.2d 1098, 1101–03 (6th Cir. 1992) (allowing the Government to recall an earlier witness to contradict the defendant's testimony that he never dealt drugs). Extrinsic evidence is permitted for impeachment by contradiction only as to non-collateral matters. *See Markarian*, 967 F.2d at 1102 ("The rule prohibits contradiction of collateral matters by extrinsic evidence but permits cross-examination on collateral points which are relevant and otherwise proper."); *see also Kincaid-Chauncey*, 556 F.3d at 932 ("When impeaching by contradiction, the fact to be contradicted must be material.").

The Government could not prevail under this approach either. First, although we have on at least one occasion permitted a party to impeach a witness's testimony by introducing extrinsic evidence to contradict its contents, *see Markarian*, 967 F.2d at 1101–03, we have expressed skepticism as to whether impeachment by contradiction is permissible in this circuit, *see United*

*States v. Scott*, 693 F.3d 715, 721–22 (6th Cir. 2012) ("We have not recognized the doctrine of impeachment by contradiction, and we need not do so today." (citation omitted)); *United States v. Todd*, 431 F. App'x 412, 416 (6th Cir. 2011) (discussing use of impeachment by contradiction in other circuits and noting that this circuit has not adopted it). Second, at least one circuit has limited impeachment by contradiction to statements made on direct examination, not answers brought out on cross. *Kincaid-Chauncey*, 556 F.3d at 932 (citing *United States v. Green*, 648 F.2d 587, 596 n.12 (9th Cir. 1981)). *But see Markarian*, 967 F.2d at 1103 (allowing extrinsic evidence to impeach statements made on direct examination and "broadened" on cross). Finally, and most importantly, such extrinsic evidence is still subject to ordinary rules of admissibility, which would include authentication. *See Markarian*, 967 F.2d at 1101–03 (permitting the Government to recall an earlier witness to contradict the defendant's testimony that he never dealt drugs when paired with limiting instruction about hearsay). The district court therefore abused its discretion in allowing the Government to play the video for the jury.

Even if the Government were somehow permitted to show the video to the jury for impeachment, however, our analysis would be unchanged because the jury was never instructed to consider the video for impeachment purposes only. Further, the Government doubled down in its closing argument when it invoked the video not as evidence that Craig's testimony was not credible, but as evidence that he had possessed the gun before the day of the shootout. The evidence was not actually used for the limited purpose of impeachment.

To be sure, the jury received a general instruction that evidence "includes only what the witnesses said while they were testifying here under oath, the exhibits that I allowed into evidence, and the stipulations that the lawyers and the parties agreed to." R. 47 at PageID 441. However, when the jury asked to see the video during deliberations, the court instructed: "what you have to do is just call into your recollection of that." *Id.* at PageID 500. Although we will presume jurors will follow the instructions they receive, *e.g.*, *United States v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001), we cannot presume that a juror would parse these competing instructions and choose to follow the generic instruction about evidence generally rather than the specific (and unrestricted) instruction that they should call into their recollection the contents of the video.

The Government argues in the alternative that although the video was not authenticated, it could have been. Specifically, the Government contends that the video could have been authenticated by the testimony of Officer Rivers and Officer Ball in which they discussed a rap video that shared common features with the video played to the jury. We reject this argument because the Government provides no authority under which an appellate court could rule on authentication in the first instance. Regardless of whether the Government could have authenticated the document, the fact remains that it did not.[3] Further, Craig points out that the Government's arguments about authenticity are not as airtight as it suggests. Both Officer Rivers and Officer Ball testified that Craig was wearing the same jacket when he was arrested as the masked individual in the video. But, Craig contends, the jackets are actually different, with different zippers and features. It is the job of the trial court to address these competing factual claims before permitting the jury to see the exhibit. That was not done here.

Finding that the district court erred in allowing the Government to play this video for the jury, we turn to whether the error was harmless.

### III.

The Government contends that any error in showing the video to the jury was harmless because there was overwhelming evidence of Craig's guilt. The other proof included the observations of two officers that he threw the firearm into the vehicle, that he was wearing the holster when he was apprehended, that his DNA was found on the gun, and that there was gunshot residue on his hands.

This court applies the harmless-error test to evidentiary errors. *United States v. Baker*, 458 F.3d 513, 520 (6th Cir. 2006). "[I]f one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States,* 328 U.S. 750, 765 (1946); *accord, e.g.*, *United States v. Haywood,* 280 F.3d 715, 724 (6th Cir. 2002); *see also United States v. Johnson*,

---

[3]At oral argument, counsel suggested that the ability to authenticate the document should be considered as part of the harmless-error analysis, but did not direct the court to a single case in which the harmlessness of an evidentiary ruling was judged by whether the proponent could have obtained admission of the evidence had it done things differently at trial.

440 F.3d 832, 847 (6th Cir. 2006) ("The harmless error standard calls for reversal when the appellate court lacks a fair assurance that the outcome of a trial was not affected by evidentiary error." (quoting *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005))).

We find that the error was not harmless. First, the video was extremely prejudicial. If the jury believed the individual was Craig, the video showed him possessing a firearm with an extended magazine, precisely the crime for which he was being tried. The rap contained violent and profane language, and the individual's body language was menacing.

The video was also extremely damaging to Craig's testimony. There was no question that Craig possessed a firearm, and his whole case rested on his justification defense. That defense turned on a credibility determination; only if the jury believed his testimony that he possessed the gun no longer than necessary to ward off the attackers could it find his possession was justified and declare him not guilty. But, if the jury believed the man in the video was Craig, it could find that Craig previously owned or possessed the extended-magazine firearm for which he was ultimately charged. Prior ownership or possession of the firearm strongly refutes his version of events, in which the firearm was thrust upon him by a third party in the heat of a firefight. The Government emphasized this precise point in closing arguments.

Second, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." *Smith v. Smith*, 166 F.3d 1215 (6th Cir. 1998) (table) (quoting *Kotteakos*, 328 U.S. at 765). During deliberation, the jury's only question was a request to see the rap video. Rarely does an appellate court have such direct insight into the inner workings of deliberations or such a clear indication that one specific piece of evidence likely influenced the jury.

Social media is a ubiquitous facet of modern life and provides law enforcement an unfiltered view into the daily affairs and personal world of a potential suspect. But social media platforms, and the videos they contain, are subject to manipulation and cannot easily be verified. They contain images and videos depicting thousands of individuals. Those individuals might look similar to thousands of different defendants. And, even if they do not, they could be

modified to do so. This court has nevertheless permitted the introduction of certain social media content, provided the Government lay a sufficient evidentiary foundation to establish that they are what the proponent claims them to be. *Thomas*, 701 F. App'x at 419–20. But, the Government here failed to meet even this requirement. No one at trial testified that Craig was the individual depicted, and no one testified as to where and how they found the video. To allow the Government to play to the jury a video of an individual who may look somewhat like the defendant with no evidentiary basis for where the video came from or why the jury should believe it shows the defendant is cause for significant concern. Although the Government furnished other evidence at trial in support of its case, the sensational and visceral aspects of the video—an unadmitted exhibit—appears to have infected the jury's deliberations.

The Government may have the right to play the video for the jury, but it must do so the right way—through proper authentication and other compliance with the Federal Rules of Evidence.

Having determined that a new trial is required, we do not reach the issue of Craig's sentencing.

**IV.**

Accordingly, we **VACATE** Craig's conviction and **REMAND** for a new trial.