NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0361n.06

Case No. 24-5841

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| ROLLIE DESHAWN LAMAR, | ) ) | |
| Defendant - Appellant. | ) ) ) | OPINION |

**FILED**
Jul 23, 2025
KELLY L. STEPHENS, Clerk

Before: MOORE, GRIFFIN, and RITZ, Circuit Judges.

**RITZ, Circuit Judge.** Rollie Lamar appeals his convictions stemming from a marijuana distribution conspiracy. He argues that at trial, the district court improperly admitted hearsay testimony from his co-conspirator's former girlfriend. He also argues there was insufficient evidence to convict him of possessing a firearm in furtherance of a drug crime. We affirm.

## BACKGROUND

In 2022, police saw Rollie Lamar posting pictures of bulk marijuana, cash, firearms, and expensive items on his Snapchat social media account. As a result, the police began surveillance of Lamar's apartment in Lexington, Kentucky. Kristopher Caylin Lewis visited Lamar's apartment frequently, so officers placed a tracker on Lewis's car. From the tracker, officers learned that Lewis drove to and from Detroit, Michigan on one occasion. Officers saw Lewis travel in the direction of Detroit in a rental car on two other occasions. Upon returning from these trips, Lewis would unload large black duffle bags in Lamar's garage. Soon after, Lamar would post on his Snapchat that, "[i]t's here," before driving to a different apartment complex to sell marijuana.

Police eventually stopped Lewis after he picked up a rental car from the airport and drove it to Lamar's apartment. Lewis had $27,000 in the car. That same day, police executed a search warrant on Lamar's apartment, where they found two guns in the refrigerator and $1.84 million cash in the attic. Lamar did not open the door when officers arrived, and officers suspected that he was moving the guns and cash into hiding places.

The government charged Lamar with drug and gun crimes, and Lamar went to trial. On the last day of trial, the government called Anna Sizemore, Lewis's girlfriend, to testify. (Lewis had died by the time of trial.) Sizemore testified about her relationship with Lewis, Lewis's relationship with Lamar, Lewis's trips to Detroit, and various details of the conspiracy. Lamar's lawyer objected to Sizemore's testimony, arguing that her knowledge of Lewis and Lamar's relationship and the conspiracy could have come only through Lewis's out-of-court statements and was thus hearsay. The district court overruled the objection, concluding that Sizemore's testimony was based on her first-hand knowledge from living with Lewis.

Ultimately, the jury convicted Lamar of: (1) conspiracy to distribute 1000 kilograms or more of marijuana in violation of 21 U.S.C. § 846(a)(1); (2) conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); (3) marijuana distribution in violation of 21 U.S.C. § 841(a)(1); and (4) possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A). The district court sentenced Lamar to 220 months in prison. Lamar now appeals.

## ANALYSIS

Lamar raises two challenges to his conviction. First, he argues that because Sizemore's testimony was rooted in hearsay, the district court should have excluded it. Second, he argues that the evidence at trial was insufficient to support his conviction for possession of a firearm in

furtherance of a drug crime, because there was no nexus between the drugs and the firearms. Both arguments are unavailing.

## I.     Sizemore's testimony

Lamar first argues that Anna Sizemore's testimony was inadmissible hearsay. Lamar preserved the hearsay objection by raising it a number of times at trial. *See United States v. Heflin*, 600 F. App'x 407, 411 (6th Cir. 2015). Although we review hearsay-exclusion decisions for an abuse of discretion, we review de novo the determination of whether a statement constitutes hearsay. *United States v. Johnson*, 79 F.4th 684, 700 (6th Cir. 2023). Even where a district court erroneously admits hearsay evidence, we nonetheless affirm if the error was harmless. *United States v. Caver*, 470 F.3d 220, 239 (6th Cir. 2006). An error is not harmless if it "substantially swayed" the result. *United States v. Craig*, 953 F.3d 898, 906 (6th Cir. 2020) (internal citation omitted); *accord United States v. Grogan*, 133 F.4th 553, 563 (6th Cir. 2025).

The district court properly admitted Sizemore's testimony. "Hearsay" is an out-of-court statement offered to show the truth of the matter it asserts. Fed. R. Evid. 801(c). Accordingly, if a witness testifies from her own personal observations, then her testimony is not governed by the hearsay rules, but by those governing lay witness testimony. *See* Fed R. Evid. 602; *United States v. Vosburgh*, 602 F.3d 512, 539 n.27 (3d Cir. 2010) ("Testimony that conveys a witness's personal knowledge about a matter is not hearsay."). So, to avoid the hearsay issue Lamar raises, the government needed to lay a foundation for how Sizemore came to know many of the details of the conspiracy. Fed. R. Evid. 602; *see also United States v. Franklin*, 415 F.3d 537, 549 (6th Cir. 2005) (holding that testimony should not be excluded for lack of knowledge unless "no reasonable juror" could believe the witness could have perceived the events they testified about (internal citation omitted)).

We agree with the district court that the government laid an adequate foundation for Sizemore's personal knowledge as to (1) the frequency of Lewis's trips to Detroit, and (2) the fact that Lewis's finances were heavily tied to these trips and Lamar. First, the government emphasized Sizemore's testimony that Lewis would drive to Detroit twice a week for about a year. *See, e.g.*, RE 141 Trial Tr., at PageID 1299 ("He was going up there once or twice a week for about a year. He was taking money up there with him."). The government used this information to extrapolate the amount of money involved in the conspiracy, estimating that Lewis drove to Detroit 104 times.

Sizemore had personal knowledge of the frequency of Lewis's trips. Sizemore testified that she and Lewis shared locations with each other using their iPhones. And she frequently checked his location while he was away to ensure his safety. Based in part on the location tracking, Sizemore estimated that Lewis went to Detroit at least twice a week for a year. Her testimony therefore came from her own observations, not hearsay.

Sizemore's testimony about Lewis's finances is more difficult to parse. The government relied on Sizemore's testimony to show that Lamar would pay Lewis for his drives to Detroit, and Lewis would use that money to rent vehicles and make payments on his Audi. For example, in his closing statement, the prosecutor said to the jury: "You recall the testimony of Ms. Sizemore. [Lewis] got the money from Rollie, which he put into his account to rent the vehicles. That's a financial transaction. He used a bank, he used his debit card, swiped it. That is a transaction." RE 141 Trial Tr., at PageID 1303. The debit transactions, in turn, were important because they supported the jury's conviction for conspiracy to commit money laundering. The government did not offer bank or rental car records, so the fact that Lamar had paid via debit card directly tied the drug trafficking to financial transactions.

But the government laid an adequate foundation to show that Sizemore had knowledge about the broad contours of Lewis's finances. Sizemore testified that she and Lewis lived together and split household expenses. She knew he left his job at the University of Kentucky and that he was covering expenses, like his car payment, through the trips he made to Detroit at the request of Lamar. She also knew he would make car payments over the phone using his debit card. She even returned his rental car to Enterprise at the airport on the day that he was arrested. And she knew that to rent cars using cash at the airport, one needed to use a debit card. All of this testimony laid a foundation for Sizemore to know first-hand that Lewis rented cars at the airport using his debit card.

True, the prosecutor did not lay a foundation to establish that Sizemore knew precise details about Lewis's finances. So, the specific amount of money Lewis made for each trip to Detroit and exactly how much of that was invested in subsequent trips may have been available to Sizemore only through Lewis's statements. But the government did not rely on such mathematical specifics in its closing argument. Rather, it relied on the fact that Lewis's income came from Lamar, and that Lewis paid via debit card. Sizemore's testimony to that effect came from personal knowledge. Any remaining hearsay details in Sizemore's testimony constituted harmless error.[1]

## II.     Firearm conviction

Lamar next argues that insufficient evidence supported his conviction for possession of a firearm in furtherance of a drug crime. In reviewing sufficiency-of-the-evidence claims, we ask whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

---

[1] The government additionally argues that Sizemore's testimony fell into the hearsay exclusion for statements of co-conspirators. *See* Fed. R. Evid. 801(d)(2)(E). Because we find the government's personal knowledge argument successful, we do not address the co-conspirator exclusion.

*United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

There was ample evidence linking Lamar's possession of firearms to drug trafficking. Defendants use a gun in furtherance of drug trafficking when they use a gun "to protect . . . the proceeds of drug sales, or the dealer himself." *United States v. Maya*, 966 F.3d 493, 500 (6th Cir. 2020) (quoting *United States v. Bailey*, 882 F.3d 716, 721 (7th Cir. 2018)). The crime can be proven through circumstantial evidence alone. *Id.* Here, officers found two guns in the refrigerator of Lamar's house and $1.84 million in the attic. Lamar had previously posted Snapchat images of what appears to be the same type of gun next to stacks of cash. Based on this evidence, a rational jury could have found the guns to be connected to the drug crime.

Lamar argues that the guns found in his refrigerator were not specifically linked to the drugs or drug transactions, and thus there was no "nexus" between the drug trafficking and the firearm. *See United States v. Brown*, 732 F.3d 569, 576 (6th Cir. 2013). But the jury could have credited the government's argument and trial testimony indicating that Lamar moved the guns to the refrigerator when police arrived to execute a search warrant. Further, the guns were located in the same residence as "proceeds" of drug sales, namely the $1.84 million found in Lamar's attic. *See Maya*, 966 F.3d at 502. Thus, a rational trier of fact could have determined that Lamar possessed the guns to protect the proceeds of drug transactions and himself.

**CONCLUSION**

We affirm.